In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1080

FULTON COUNTY EMPLOYEES RETIREMENT SYSTEM,
on behalf of a class,

*Plaintiff-Appellant*,

*v.*

MGIC INVESTMENT CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08-C-458—**Lynn Adelman**, *Judge*.

ARGUED JANUARY 12, 2012—DECIDED APRIL 12, 2012

Before EASTERBROOK, *Chief Judge*, and ROVNER and TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. MGIC Investment Corporation insures mortgage loans. Lenders prefer security beyond the borrower's promise to pay plus the value of the real property. The market price of land or a house may decline; its worth may have been overestimated;

borrowers may fail to make payments or allow the collateral to fall into disrepair. Several governmental agencies offer mortgage insurance. When no governmental body will insure a loan—or when public insurance is limited (often it covers only 80% of the collateral's appraised value)—firms such as MGIC stand ready to sell private mortgage insurance. With insurance in hand, lenders securitize the loans (that is, sell securities in packages containing many loans), raising money that they can lend to other people who seek housing.

Both public and private mortgage-insurance markets incurred large losses in the financial crunch that began with the decline of the prices of securities based on packages of mortgage loans. The price of MGIC's securities fell substantially—though MGIC, unlike many other firms, survived and sells mortgage insurance to this day. Precisely because it survived a steep fall in the price of its securities, MGIC is an attractive target for litigation. Four class-action suits were filed under the Securities Exchange Act of 1934. These suits were consolidated in the Eastern District of Wisconsin and dismissed when the judge concluded that the complaint did not meet the standard set by the Private Securities Litigation Reform Act (PSLRA). 2010 U.S. Dist. LEXIS 14037 (E.D. Wis. Feb. 18, 2010), relying on 15 U.S.C. §78u–4(b), as interpreted by *Tellabs*, *Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308 (2007). Plaintiffs asked leave to amend their complaint to meet the district judge's requirements, but the judge found the proposed amendment no better than the original and denied the motion as futile. 2010 U.S. Dist. LEXIS 134615 (E.D. Wis. Dec. 8, 2010).

Of all the original plaintiffs, only one filed a notice of appeal. And of all the contentions in the complaints, only one survived to the appellate briefs. The other claims presented to the district court have been abandoned.

The one remaining plaintiff's sole remaining claim is that fraud occurred during and in connection with MGIC's quarterly earnings call on July 19, 2007. The claim starts with this paragraph in a press release:

> With respect to liquidity, the substantial majority of C-BASS's on-balance sheet financing for its mortgage and securities portfolio is dependent on the value of the collateral that secures this debt. C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities. While C-BASS's policies governing the management of capital risk are intended to provide sufficient liquidity to cover an instantaneous and substantial decline in value, such policies cannot guarantee that all liquidity required will in fact be available.

Appellant Fulton County Employees Retirement System (Fulton for short) also contends that some statements made during the earnings call were fraudulent. Before evaluating these contentions, we need to explain C-BASS.

C-BASS stands for Credit-Based Asset Servicing and Securitization LLC. MGIC owned 46% of its equity units. Radian Group Inc., another mortgage insurer, also owned 46% of the units; managers at C-BASS owned the

remaining 8%. C-BASS was in the securitization business: it bought single-family residential-mortgage loans (most of them subprime), packaged them, and sold securities in the packages. It borrowed money to do this. The packages served as security for the loans. If the value of a package fell, the businesses that had provided C-BASS's capital saw their collateral eroding. Contracts entitled these lenders to demand that C-BASS either repay the loans or put up additional collateral, so that the ratio of the collateral's value to the outstanding balance did not fall below contractually specified levels. Such a demand is known as a margin call.

As the subprime market faltered, lenders began making margin calls. C-BASS began 2007 with $300 million in cash reserves. During the first three months of that year, it received and met $200 million in margin calls. It ended the quarter with $200 million in cash reserves, having made some money on operations. During the second three months of 2007, margin calls came to $90 million. On July 19, the day of the conference call, C-BASS's cash reserves were $150 million. Its ability to meet margin calls affected its viability, and thus the value of the securities that MGIC owned. This was a subject of the press release in which MGIC said that C-BASS had "substantial liquidity."

Fulton contends that this statement was false, and it offers two facts to support that proposition. First, from July 1 through 18 C-BASS had met $145 million in margin calls, implying that the $150 million remaining on July 19 might not last long. The purpose of

the conference call was to discuss financial results during the months April, May, and June; MGIC did not discuss C-BASS's operations during July 2007. Fulton says that it should have and that silence made the "substantial reserves" statement misleading. Second, between July 19 and August 2 C-BASS received an additional $470 million in margin calls. It met some of these calls with a combination of internally generated cash and additional investments from MGIC and Radian. But on July 30 MGIC decided that it had had enough. It declined to put up additional cash and issued a press release declaring that its investment in C-BASS, which at one time MGIC had carried on its books as worth $516 million, was "materially impaired." In accounting-speak, this is equivalent to announcing that an investment may be written off as a loss. Fulton contends that MGIC should have seen these developments coming and that its failure to announce them at the July 19 conference call made the press release materially misleading.

The district court wrote (and we concur) that the "substantial liquidity" statement was true, both absolutely ($150 million is a lot of money) and relative to the needs of C-BASS's business. C-BASS began 2007 with $300 million in reserves, met $435 million in margin calls before July 18, and still had $150 million in reserves on July 19. This also means that the complaint flunked the PSLRA's requirement for pleading *scienter*: Since C-BASS had depleted reserves by only $150 million in meeting 6½ months of margin calls, managers could say that the remaining $150 million was "substantial" liquidity without demonstrating bad intent. *Tellabs* holds that a com-

plaint must contain facts rendering an inference of *scienter* at least as likely as any plausible opposing inference. 551 U.S. at 324.

That's not all. The "substantial liquidity" statement was immediately followed by a warning that C-BASS's reserves might turn out to be insufficient. This was not the sort of generic warning deemed inadequate in *Asher v. Baxter International Inc.*, 377 F.3d 727 (7th Cir. 2004). It spoke to the problems C-BASS and other participants in the subprime mortgage market had encountered in 2007. More than that: The whole paragraph that Fulton highlights was itself a warning. It appears in the press release, together with other warnings, under this caption: "Our income from joint ventures could be adversely affected by credit losses, insufficient liquidity or competition affecting those businesses." The press release went on to detail problems MGIC was encountering, including the liquidity risk at C-BASS. The goal of this paragraph was to let investors know about the trouble without painting too gloomy a picture. A balancing act of that nature cannot sensibly be described as fraud.

Although Fulton insists that MGIC must have seen the next $470 million in margin calls coming, it did not. If it had seen the cliff, it would have stopped contributing capital to C-BASS before July 23, when it turned off the spigot. Until then MGIC thought that C-BASS was going to pull through and backed that belief with cash, as did Radian Group. The most the complaint's allegation could support is the proposition that MGIC's managers

*should* have seen the looming problem, but that's negligence rather than the state of mind required for fraud.

Even "should have seen" may be too strong. The subprime market had been in decline during the first half of 2007, but that did not necessarily imply a continuing slump, let alone a collapse. For every seller of subprime loans in 2007 who thought them overpriced, there was a buyer who expected to make a profit when the market went back up. The crisis took many experts by surprise. *See, e.g.,* Frederic S. Mishkin, *Over the Cliff: From the Subprime to the Global Financial Crisis*, 25 J. Econ. Perspectives 49 (Winter 2011); Francis A. Longstaff, *The subprime credit crisis and contagion in financial markets*, 97 J. Fin. Econ. 436 (2010). One of the core findings of modern financial economics is that "trends" in market prices do not predict future prices; that a security's price has fallen four months in a row does not imply a fall the next month. *See, e.g.,* Burton G. Malkiel, *A Random Walk Down Wall Street* (10th ed. 2012). It takes new information to move prices either up or down.

What new information might that be? It would be information about the economy as a whole, or the mortgage-loan business as a whole; Fulton does not contend that any of the information that led to the price decline and thus the margin calls was specific to C-BASS. This means that MGIC's managers did not have any private information that they could have revealed. The problem was market-wide. If MGIC's managers saw the collapse coming, so could anyone else who studied the markets.

Securities law requires issuers to disclose firm-specific information, not news that concerns the industry or economy as a whole. Thus we held in *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989), that a firm building a nuclear power plant could not be liable for failing to tell investors that the Nuclear Regulatory Commission was making it more difficult, and more expensive, for operators to finish and operate plants. Reporters and investors well knew that fact, which hurt the value of all electric utilities that had nuclear plants in operation, under construction, or in planning. Just so here. In July 2007 the whole world knew that firms that had issued, packaged, or insured subprime loans were in distress. Nothing MGIC said, or didn't say, could conceal that fact.

Judge Friendly famously said that there is no securities fraud by hindsight. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). Issuers need not be prescient. The July 19 press release did not misrepresent the past or C-BASS's current condition, and MGIC had no duty to foresee the future.

Fulton contends that some statements made during the conference call were fraudulent independent of the press release. The statements in question were made by Bruce Williams, the chief executive of C-BASS, and John Draghi, its chief operating officer. Fulton wants to hold MGIC vicariously liable for their statements under §20(a) of the 1934 Act, 15 U.S.C. §78t(a): "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable

jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Fulton contends that MGIC's 46% interest in C-BASS made it a controlled entity for which MGIC is responsible.

Fulton relies on two decisions saying that a significant bloc of shares short of a majority can create control. See *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992); *Kirsch Co. v. Bliss and Laughlin Industries, Inc.*, 495 F. Supp. 488, 495 (W.D. Mich. 1980). That's easy to see when other investments are widely distributed. A bloc of 20% or less may be enough for working control when no one else holds a substantial position. But that's not how C-BASS's units were aligned. MGIC had 46% and Radian another 46%. The point of such equal positions is to prevent both MGIC or Radian from exercising unilateral control. Unless MGIC and Radian agreed, C–BASS could operate as it pleased, since its own managers held the balance of power (the last 8%). This is a common investment structure in joint ventures.

Fulton does not contend that MGIC directed Williams or Draghi to say what they did. Nor does Fulton contend that, as a condition of participating in MGIC's earnings call, Williams or Draghi promised to support the MGIC party line (if there was one). They appear to have been independent agents, speaking for themselves (and of course for C-BASS, over which as CEO and COO they had

day-to-day control). We asked at oral argument whether any case under §20(a) holds that either of two equally matched bloc holders is treated as a control party. None of the lawyers was aware of such a decision. We searched independently and did not find one. For the reasons we have given, it would be inappropriate to hold MGIC liable under §20(a) for statements made by managers of a different firm that MGIC could not control without the assent of a third party holding an equally large bloc.

If MGIC is not liable under §20(a), Fulton contends, then MGIC and the three MGIC managers named as defendants are directly liable under §10(b), 15 U.S.C. §78j(b), and Rule 10b–5, because by inviting Williams and Draghi to speak MGIC effectively "made" their statements itself. That line of argument cannot be squared with *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), which holds that the "maker" of a statement is the person with ultimate authority over the language. We have explained why Williams and Draghi, not MGIC or its officers, had ultimate authority over their own statements. *Janus Capital* prevents treating MGIC as the statements' maker.

Fulton proposes to get around *Janus Capital* by asserting that MGIC had a duty to correct any errors Williams or Draghi made. But no statute or rule creates such a duty— if there were one, *Janus Capital* itself would have come out the other way. The statements at issue in *Janus Capital* appeared in a prospectus of Janus Investment Fund—which, as the author of the prospectus, controlled

its contents. Some propositions in the prospectus were attributed to Janus Capital Management, which plaintiffs sought to hold liable. The Court held that this would be improper, because the mutual fund and not the investment adviser determined the prospectus's contents. Janus Capital Management could have issued a press release denouncing or correcting the prospectus but didn't. Just so with MGIC. It could have added its own footnotes or corrections to what Williams and Draghi said, but it is no more liable than was Janus Capital Management for keeping silent when someone else spoke.

That leaves only the direct claims against Williams and Draghi personally. We agree with the district court, for the reasons it gave, that Fulton's complaint does not meet the statutory standard for demonstrating fraud. Williams and Draghi accurately outlined C-BASS's financial position as of July 19. Neither they nor MGIC is liable under the federal securities laws for failing to foresee what was to happen during the next two weeks.

AFFIRMED