**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENET CIRCUIT

---

KENNETH Z. SLATER; W. ALLEN
GAGE; NICHOLAS F. ALDRICH,
SR., individually and on behalf of the
Aldrich Family; DONALD SMITH, on
behalf of plaintiff and all others
similarly situated; ELAINE
SNYDMAN; DENIS ROY
GONSALVES; DAVID SEDLMYER;
BETTY L. MANNING; and JOHN
LEARCH,

       Plaintiffs-Appellants,

   v.

A.G. EDWARDS & SONS, INC.;
BB&T CAPITAL MARKETS, a
division of Scott & Stringfellow, Inc.;
CITIGROUP GLOBAL MARKETS,
INC.; OPPENHEIMER & COMPANY.
INC.; RBC DAIN RAUSCHER
CORP.; STIFEL, NICOLAUS &
COMPANY, INC.; FBR CAPITAL
MARKETS & CO., formerly known as
Friedman, Billings, Ramsey & Co.;
BEAR, STEARNS & COMPANY,
now J.P. MORGAN SECURITIES
INC.; and UBS SECURITIES LLC,

       Defendants-Appellees.

No. 11-2170

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:07-CV-00815-JB-WDS)

Andrew L. Zivitz, Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania (Benjamin J. Sweet, Christopher L. Nelson, Michelle M. Newcomer, and Richard A. Russo, Jr., Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania, and Betsy C. Manifold and Patrick H. Moran, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, California, and Turner W. Branch and Cynthia L. Zedalis, Branch Law Firm, Albuquerque, New Mexico, with him on the briefs), Attorneys for Appellants.

Jonathan C. Dickey, Gibson, Dunn & Crutcher LLP, New York, New York (Sapna Desai, Gibson, Dunn & Crutcher LLP, New York, New York, and Blaine H. Evanson, Gibson Dunn & Crutcher LLP, Los Angeles, California, with him on the brief), for Appellees A.G. Edwards & Sons, Inc., BB&T Capital Markets, Citigroup Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and Stifel, Nicolaus & Co., Inc., and Steven M. Farina (Margaret A. Keeley and Allison B. Jones with him on the brief), Williams & Connolly LLP, Washington, District of Columbia, for Appellee FBR Capital Markets & Co., formerly known as Friedman, Billings, Ramsey & Co., and David C. Bohan, David Stagman, Laura A. Brake and John F. Anzelc, Katten Muchin Rosenman LLP, Chicago, Illinois, on the brief for Defendant UBS Securities LLC and Appellee Bear, Stearns & Company, now J.P. Morgan Securities LLC.

Before **TYMKOVICH**, **HOLLOWAY**, Senior Judge, and **HOLMES**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Thornburg Mortgage, Inc. was an originator and purchaser of home loans and one of the many casualties of the 2007-2009 financial crisis. Cut off from its usual sources of financing, Thornburg attempted to raise new capital through a series of stock offerings in 2007 and early 2008. But as the mortgage market continued to sour, Thornburg's problems mounted and the value of its stock declined. Investors in those offerings then brought a class action suit against

Thornburg's underwriters, alleging violations of § 11 of the Securities Act based on omissions and misrepresentations in the offering documents. In a thorough opinion, the district court dismissed the claims against the underwriters on the grounds that there were no omissions or misrepresentations in the offering documents and, even if there were, they were not material.

The Plaintiffs broadly challenge all of the district court's holdings. They contend that the offering documents contained material misrepresentations and omissions. As we explain, the Plaintiffs' contentions are not based on a contemporaneous look at Thornburg's statements and disclosure obligations during the offering periods. With that perspective in mind, we conclude there were no misrepresentations or omissions in the offering documents and, accordingly, AFFIRM.

## I.  Background

Thornburg was a publicly traded residential mortgage lender focused on the adjustable-rate mortgage (ARM) market, and funded its mortgage purchases and originations through a variety of financing sources. These financing sources included public offerings of its securities, reverse-repurchase agreements,[1] short-

---

[1] A repurchase agreement is an agreement whereby the seller transfers a security to the buyer for cash, but agrees to repurchase the security at a later date, usually for a higher amount than the original sale price.

term borrowing through asset-backed commercial paper,[2] and collateralized debt obligations (CDOs),[3] a type of mortgage-backed security (MBS). Thornburg both packaged its own MBSs (from its pool of originated and acquired loans) and purchased already-packaged MBSs. Thornburg was highly leveraged, meaning it borrowed substantial funds compared to its available assets. Similar to a bank, Thornburg profited from the differences between the interest rates at which it borrowed money and the interest rates at which it lent money.

Thornburg's business focused on the prime market—that market consisting primarily of borrowers with good credit scores who can document their income. But it also originated and acquired Alt-A loans, which are loans to otherwise creditworthy individuals who cannot or do not provide documentation of their income, have a higher percentage of debt compared to their income (debt-to-income ratio), or pay less as a down payment than do prime borrowers. These loans are generally considered riskier than prime loans, but not as risky as

---

[2] Asset-backed commercial paper is a short-term loan, usually backed by some physical asset. The maturity dates are usually between three and six months.

[3] A CDO is a pool of loans (of any quality) that is divided into, and sold in, "tranches" according to priority of repayment in case of default. Senior tranches, which have the highest priority in repayment, are usually rated AAA; "mezzanine tranches" have a lower priority in repayment and are usually rated from AA to BB; equity tranches are rated even lower and have the lowest priority in repayment.

subprime loans. Subprime loans are loans to individuals with poor credit histories and often require even less as a down payment than do Alt-A loans.

In 2006 and 2007, the market for subprime and Alt-A mortgages declined as borrowers began to default on their loans. Rating agencies downgraded many mortgage-backed securities and collateralized debt obligations. The declining housing market also hurt the commercial paper market, and Thornburg was not able to raise the money it needed to extend new loans. As the commercial paper market faltered, Thornburg increasingly relied on repurchase agreements, using its mortgage-backed securities as collateral. The repurchase agreements required Thornburg to meet margin calls (*i.e.*, post additional collateral, usually cash) if the value of the original collateral declined. And, importantly, the repurchase agreements contained cross-default provisions, whereby a default on any one agreement (by failing to meet a margin call) triggered default on Thornburg's other agreements.

Unable to rely solely on these forms of financing, Thornburg sought to raise more cash by conducting public stock offerings. The offerings were made according to a shelf registration statement, filed with the SEC on May 20, 2005. The registration statement prospectively incorporated by reference Thornburg's quarterly, annual, and current reports. Each offering was also accompanied by separate prospectuses.

The first offering was on May 4, 2007, where Thornburg issued 4.5 million shares for $121.7 million. It conducted another offering on June 19, 2007, issuing another 2.75 million shares for $68.75 million. The offering documents for these sales incorporated Thornburg's 2006 10-K Annual Statement, which detailed the basis of Thornburg's business and financing: acquiring and originating loans, packaging them into securities, using the securities as collateral for its repurchase agreements, and repeating the process. Despite disclosing that it possessed a significant chunk of "stated income" (or Alt-A) loans, Thornburg did not specifically disclose that it possessed $2.9 billion of *purchased* MBSs backed by Alt-A loans.[4]

On August 14 and 20, 2007, Thornburg disclosed that the value of its AAA-rated mortgage securities—the bulk of its portfolio—was declining and, as a result, the company was experiencing margin calls. In the August 20 statement, Thornburg announced that it had sold over $20 billion of its MBSs to meet the margin calls. Analysts warned that Thornburg was "within days of failing." App. 141 (complaint quoting August 20, 2007 news article).

Thornburg nonetheless conducted another public stock offering on September 7, 2007, in an attempt to recapitalize the company. In the September

---

[4] In its 10-K Annual Statements and 10-Q Quarterly Statements filed with the SEC, Thornburg designated its holdings of Alt-A loans as "stated income/no ratio"—meaning the borrower merely stated, but did not provide proof of, his income. Otherwise, Thornburg generally did not use the term "Alt-A" in its SEC filings.

prospectus preceding the Offering, Thornburg disclosed that it had been experiencing sizable margin calls, that the value of its loan portfolio had been declining, and that its traditional sources of funding—securitization of loans and the asset-backed commercial paper market—were "not functioning." Supp. App. 1244. Thornburg warned that the mortgage market may not improve and that the company may experience further margin calls. Thornburg conducted a final stock offering in January 2008.

The mortgage market continued to decline, and on February 28, 2008, Thornburg disclosed that it had been subject to an additional $300 million in margin calls. Thornburg also disclosed that $2.9 billion in purchased MBSs backed by Alt-A loans had collateralized its repurchase agreements. A decline in the value of the Alt-A MBSs had triggered the margin call. On the day of Thornburg's announcement, Thornburg's stock price declined 15 percent, from $11.54 per share to $9.86 per share. On March 3, 2008, Thornburg disclosed that it had been subject to an additional $270 million in margin calls as of February 29, 2008, and that it was in default with one of its repurchase agreement counterparties. Finally, on March 5, 2008, Thornburg revealed that J.P. Morgan was the counterparty with which it was in default, and that this event had triggered the cross-default provisions in the rest of Thornburg's agreements. Overall, from February 27 to March 6, the value of Thornburg's stock declined by more than 90 percent.

The Plaintiffs, investors in the stock offerings, had filed a lawsuit on August 21, 2007, just one day after Thornburg announced it had sold $20.5 billion of its MBSs to meet margin calls. On May 27, 2008, after the January offering and over two months after the precipitous drop in Thornburg's stock price, the Plaintiffs filed a consolidated complaint. The consolidated complaint targeted— in addition to Thornburg and Thornburg's officers (who are not parties to this appeal)—the banks that underwrote the stock offerings ("Underwriters").[5] The complaint alleged that the offering documents for the four public offerings contained material misstatements and omissions, actionable under § 11 of the Securities Act.

The Underwriters moved to dismiss the complaint as failing to state a claim against them. In opposing the motion to dismiss, the Plaintiffs pointed to omissions and misrepresentations for which the Underwriters were strictly liable: (1) Thornburg's holdings of $2.9 billion in purchased MBSs backed by Alt-A loans; (2) the cross-default provisions in the repurchase agreements; and (3) Thornburg's 2006 financials, which its auditor KPMG had called into question. Nevertheless, the district court granted the Underwriters' motion. *See In re*

---

[5] The May and June offerings were underwritten by six entities: A.G. Edwards & Sons, BB&T Capital Markets, Citigroup Global Markets, Oppenheimer & Co., RBC Dain Rauscher Corp., and Stifel, Nicolaus & Co. The September offering was underwritten by FBR Capital Markets (FBR). The January offering was underwritten by FBR, UBS Securities, and Bear, Stearns & Co. (now owned by J.P. Morgan).

*Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236 (D.N.M. 2010) (*Thornburg I*). Referencing Thornburg's 2006 10-K Statement, filed with the SEC and incorporated into the complaint, the district court concluded that (1) Thornburg had disclosed its exposure to purchased Alt-A MBSs, (2) Thornburg had no duty to disclose the existence of the cross-default provisions in its repurchase agreements, and (3) general allegations of misstatements in Thornburg's 2006 financials did not make out a claim because KPMG had actually approved the financials.

The Plaintiffs then filed a motion for clarification to determine whether the district court had dismissed their claims with prejudice. The court interpreted this motion as a request by the Plaintiffs to file a separate motion for reconsideration and for leave to amend their complaint, which the court granted. When the Plaintiffs filed their motion for reconsideration, they presented new arguments for why Thornburg had a duty to disclose the existence of the $2.9 billion in MBSs and the cross-default provisions—specifically, that Regulations S-K and S-X, promulgated by the SEC, required such disclosures. After considering these new arguments, the court nevertheless rejected them, concluding the Plaintiffs had not pleaded facts demonstrating that Thornburg had disclosure obligations per SEC regulations. *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1257–74 (D.N.M. 2011) (*Thornburg II*). Accordingly, the court declined to change its earlier dismissal of the Securities Act claims against the Underwriters.

The Plaintiffs then appealed the district court's dismissal. While this appeal was pending, the Plaintiffs stipulated to dismiss the appeal as to the Underwriters who participated in the January 2008 offering.

## II. Analysis

The Plaintiffs appeal the district court's dismissal of their complaint on the ground they did not adequately plead a Securities Act violation by Thornburg. The Plaintiffs contend the district erred in holding there were no material misrepresentations or omissions relating to (1) Thornburg's holdings of $2.9 billion in Alt-A MBSs, (2) the existence of cross-default provisions in Thornburg's repurchase agreements, and (3) Thornburg's 2006 financials. As we discuss below, none of these arguments have legal merit.

### A. Legal Background

*Standard of Review.* We review de novo the district court's granting of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008). To defeat a motion to dismiss, a complaint must plead facts sufficient "to state a 'claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

In a securities case, we may consider, in addition to the complaint, documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit. *See ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). When there are allegations that certain disclosures were not made in publicly available documents, we may look to those documents to see whether such disclosures were in fact made. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). And if those documents conflict with allegations in the complaint, we need not accept those allegations as true. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Roth*, 489 F.3d at 511 (affirming "principle that the contents of the document are controlling where a plaintiff has alleged that the document contains, or does not contain, certain statements"); *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").

*Securities Act Claim.* Section 11 of the Securities Act of 1933 imposes strict liability for material misstatements or omissions in a stock offering's registration statement or prospectus. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Liability attaches to "every person who signed the registration statement" as well as to "every underwriter." 15 U.S.C. § 77k(a)(1), (a)(5). Plaintiffs pleading a § 11 claim must identify (1) a misrepresentation or an omission, that is (2) material. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Liability does not attach for any omission, but only for omissions of facts that are required as part of a registration statement or those necessary to make the statement not misleading. 15 U.S.C. § 77k(a); *see also J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008). We have held that a "duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (citation omitted).

The meaning of materiality in a § 11 Securities Act claim is identical to that in a § 10-b Exchange Act claim for securities fraud. *In re Morgan Stanley*, 592 F.3d at 360. "A statement is material only if 'a reasonable investor would consider it important in determining whether to buy or sell stock.'" *McDonald*, 287 F.3d at 998 (quoting *Grossman v. Novell*, 120 F.3d 1112, 1119 (10th Cir. 1997)). Materiality also depends on the information that already exists in the market: "[U]nless the statement significantly altered the total mix of information available, it will not be considered material." *Grossman*, 120 F.3d at 1119 (citation and internal quotation marks omitted). Though materiality is a mixed fact-law question usually reserved for the trier of fact, we do "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *McDonald*, 287 F.3d at 997 (quoting *Grossman*, 120 F.3d at 1118).

Failure to comply with an SEC regulation in the documents accompanying a stock offering can also trigger liability under § 11 of the Securities Act. 15 U.S.C. § 77k; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *J&R Mktg.*, 549 F.3d at 390. Here, the Plaintiffs raise two such regulations: Regulation S-K and Regulation S-X.

***Regulation S-K.*** Item 303 of Regulation S-K requires disclosure in offering documents of, among other things, (1) "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," 17 C.F.R. § 229.303(a)(1); and (2) any "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," *id.* § 229.303(a)(3)(ii).

In interpreting the scope of Item 303, courts have relied on guidance from the SEC, which explains that a duty to disclose arises "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835 (May 18, 1989); *see also Litwin*, 634 F.3d at 716 (relying on SEC release no. 6835 in interpreting Item 303); *J&R Mktg.*, 549 F.3d at 392 (duty to disclose not

properly alleged when plaintiffs fail to assert that trend was "known" by company). In a similar vein, the Eleventh Circuit has interpreted Item 303 as imposing a duty on companies to disclose information "that significantly or materially decreases the predictive value of [their] reported results." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002).

***Regulation S-X.*** Regulation S-X requires documents filed with the SEC to be in compliance with Generally Accepted Accounting Principles (GAAP). 17 C.F.R. § 210.4-01(a)(1). "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." *Id.*

The relevant GAAP provision here requires disclosure of "significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties." Financial Account Standards (FAS) 107, *Disclosures About Fair Value of Financial Instruments*, at ¶ 15A (1991), *amended by* FAS 161, *Disclosures About Derivative Instruments and Hedging Activities* (2008).

We now turn to the specific allegations of the Plaintiffs.

### B. Disclosure of $2.9 Billion in Purchased Alt-A MBSs

The Plaintiffs' primary allegations focus on a claim that Thornburg made actionable misstatements as part of its May, June, and September 2007 stock offerings. In particular, they argue that Thornburg made misstatements in

prospectuses and other incorporated documents that misled investors about the firm's exposure to the Alt-A and subprime mortgage markets. We separate our analysis of the May/June and September offerings.

### 1. Misstatement in May/June Offering

The Plaintiffs first argue that Thornburg made a material misstatement in its May and June offering documents when it failed to disclose its exposure to Alt-A assets while at the same time commenting about the subprime and Alt-A markets. The alleged misstatement was part of an 8-K statement, filed with the SEC on April 19, 2007, and incorporated by reference in the May and June offering documents.

In the 8-K form, Thornburg's CEO, Larry Goldstone, stated that Thornburg had "benefited from wider spreads on new prime quality mortgage assets caused by credit concerns in the subprime and Alt-A segments of the mortgage market." App. 115. The Plaintiffs contend this statement was misleading because Thornburg failed to disclose that it was exposed to risk from its own Alt-A assets. That is, Thornburg misled investors when it said it benefitted from the decline in the subprime market without also disclosing its own exposure to the subprime market.

Yet the complaint and relevant documents filed with the SEC do not support the claim that these statements were misleading. First, the focus of Thornburg's business was originating prime mortgages and acquiring investment-

grade mortgage assets. Its asset holdings reflected this fact. In its 2006 10-K statement, for example, Thornburg disclosed that it had around $51.5 billion in total ARM assets (about $28.3 billion in purchased ARM assets and $23.2 billion in ARM loans).[6] Supp. App. 257. Of its $23.2 billion in ARM loans, 21.2 percent were "stated income/no ratio," *id.* at 259, a synonym for Alt-A or subprime loans, while 78.8 percent were "full/alternative," or prime loans. And of its $28.3 billion in purchased ARM assets, 88 percent were rated AAA, and 98.4 percent were "High Quality." *Id.* at 257.

These disclosures give context to Thornburg's 8-K statement. Given its investment-grade mortgage assets primarily backed by prime loans, Thornburg's backward-looking comment that it had benefitted from a decline in the subprime market was not misleading even though Thornburg also held $2.9 billion in purchased MBSs backed by Alt-A loans. The $2.9 billion would comprise, as of December 31, 2006, only 5.6 percent of Thornburg's total assets. Even after factoring in Thornburg's portfolio of "stated income/no ratio" loans, about $4.9 billion, Thornburg's total Alt-A holdings would be less than 15 percent of its assets. With this relatively small exposure to the Alt-A mortgage market and

---

[6] In its SEC filings, Thornburg divided its ARM assets into two general categories: "purchased ARM assets" and "ARM loans." The ARM loan category consisted of loans held for securitization, loans held as collateral for debt, and loans securitized for its own portfolio. The purchased ARM assets category consisted of MBSs that Thornburg itself had not securitized but only purchased afterwards.

Thornburg's focus on originating prime mortgages, the 8-K did not paint a misleading picture of Thornburg's financial performance. All the allegations presented do not contradict Thornburg's statement that in the first quarter of 2007 Thornburg had "benefitted from the spread on new prime quality mortgage assets." App. 115.

Next, and importantly, the Plaintiffs have not alleged that in April 2007 the decline in Alt-A mortgages was severe enough to harm the then-market value of Thornburg's purchased MBS assets backed by Alt-A loans. One of the underpinnings of securitization, which drove the subprime market, was that subprime loans from different parts of the country could be pooled together and sold—on the assumption that the housing markets across the country were not linked. *See* Bruce I. Jacobs, *Tumbling Tower of Babel: Subprime Securitization and the Credit Crisis*, Fin. Analysts J., Mar. 2009, at 18 ("Rather than taking on the risk of default by one or a few borrowers in a given locality, a single []MBS diversifies risk exposures among numerous individual mortgages spread over a large area."). This served to reduce investors' exposure to an otherwise risky asset because while one part of the country could face a declining market, other parts of the country would be fine, thus diversifying the risk in any particular instrument. As a result, the market for new Alt-A mortgages could be shaky in many locales while the value of already-issued MBSs and CDOs backed by Alt-A mortgages could remain steady. *Cf.* Kathryn Judge, *Fragmentation Nodes: A*

*Study in Financial Innovation, Complexity, and Systemic Risk*, 64 Stan. L. Rev. 657, 685 (2012) (noting that with CDOs "the nonperformance of an underlying asset, be it a mortgage or MBS, may have no effect on the cash flows paid to holders of a senior tranche issued in a securitization").  This assumption seemed particularly true for Thornburg, as almost all of its purchased mortgage assets were AAA-rated, meaning, in the case of a CDO, it owned the senior tranche.

Without a contemporaneous collapse in the value of its MBSs, or at least some sign that their value would collapse shortly after the statement was made, Thornburg's portfolio of purchased MBS holdings does not darken the marginally optimistic picture painted by the 8-K.  *See id.* at 698 ("[E]arly indications that housing values may have been weakening or in decline were not immediately reflected in the prices of subprime MBSs, CDOs, and other financial instruments with linked values, even though the expected future cash flows from these financial instruments could be significantly affected by the performance of the housing market.").  Economic historians will long study the havoc wreaked by securitized financial instruments in the 2007-2009 crisis.  At the time, few economists or investment professionals foresaw the timing and breadth of the downturn.  *See generally* Michael Lewis, *The Big Short* (2010) (detailing the handful of investors who did foresee the collapse and profited handsomely from their uncommon insight).  But for the securities claims here, no further

disclosures were necessary to make Thornburg's statement truthful and accurate. As a result, the statement cannot be considered misleading.

Given our conclusion that Goldstone's statement was not misleading, we need not consider whether the omission of the $2.9 billion in Alt-A MBSs was material.

## 2. Misstatement in September Offering

Turning to the September offering, the Plaintiffs also allege those offering documents contained a materially misleading statement. The alleged misstatement was contained in the offering prospectus:

> In early August 2007, the secondary market for financing prime quality mortgage assets and rated mortgage-backed securities ("MBSs") came under severe pressure for a number of reasons. During 2007, lower credit quality loans and securities backed by subprime mortgage loans and, to a lesser extent, Alt-A mortgage loans were downgraded by ratings agencies as the credit performance of the underlying loans deteriorated and, as a result, the prices of securities backed by those loans declined.

Supp. App. 1243. The statement came in the context of Thornburg's explanation for its liquidity troubles. Prior to the decline in the MBS market, Thornburg had relied primarily on its prime mortgage assets to obtain liquidity; it pledged MBSs backed by prime mortgages as collateral for cash. The decline in the Alt-A and subprime markets infected the prime market, and the "market prices of private-label MBSs backed by prime mortgage loans suddenly and unexpectedly began to decline," thereby restricting Thornburg's access to new cash. *Id.*

The statement was misleading, the Plaintiffs contend, because it mentions the existence of a market trend relating to MBSs backed by Alt-A loans without also mentioning the company's own exposure to that trend. The Plaintiffs insist that once a company chooses to address a topic, it must "disclose all material facts about that subject." Aplts. Br. at 31 (citing *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1221 (D. Colo. 1998)); *see also Schaffer*, 29 F. Supp. 2d at 1221 ("[W]hen [defendants] chose to release selected, positive information from the first quarter statements, they should have revealed the potentially negative information as well."); *cf. Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statement, in order to be misleading, "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists").

We recognize that the statement raises the possible implication that Thornburg had no *direct* exposure to the Alt-A market but only an *indirect* exposure through the effect of the Alt-A market on the prime mortgage market. Yet even assuming that a reasonable investor would have wanted to know Thornburg's direct exposure to the Alt-A market, we cannot conclude that Thornburg failed to disclose the true state of affairs in its September offering documents.

The September prospectus expressly incorporated Thornburg's First and Second Quarter 10-Qs, or quarterly financial statements, which contain sufficient

information to render the disclosure not misleading. Those 10-Qs inform investors that Thornburg held several billion dollars of MBSs backed by Alt-A loans. The Second Quarter 10-Q discloses that, as of June 30, 2007, Thornburg held $24.5 billion of assets in its loan portfolio. Supp. App. 707. These loans were divided into two groups, those that Thornburg's subsidiary originated (about $17.1 billion) and those that Thornburg purchased (about $7.4 billion). Both groups of loans consisted of "ARM loans held for securitization, ARM loans held as collateral for Collateralized Mortgage Debt and ARM loans securitized for our own portfolio for which we retained credit loss exposure." *Id.* Thornburg disclosed that its pool of originated loans contained 11.1 percent in "stated income/no ratio" loans, and that its pool of purchased loans contained 42.2 percent of such loans. A reasonable investor would have viewed this information and could only have concluded that Thornburg had direct exposure to the Alt-A mortgage market. As a result, the disclosure of this information made Thornburg's comments about the Alt-A mortgage market not misleading.

The Plaintiffs object to this line of analysis because the $2.9 billion in MBSs backed by Alt-A loans was actually contained not in the "ARM Loans" category—about which Thornburg made disclosures relating to the proportion of stated income/no ratio loans—but in the "Purchased ARM Assets" category.[7]

_____

[7] As already noted, in its financial statements, Thornburg categorized its over $50 billion in ARM assets into one of two groups, "ARM loans," or

(continued...)

-21-

Thus, they argue, Thornburg did not disclose in 2007 the precise assets that were ultimately disclosed in 2008.

But the test for whether a statement is misleading is not whether in retrospect an investor might have wanted to know the omitted information, but whether additional material information was necessary at the time to make a statement reflect the true state of affairs. *See McDonald*, 287 F.3d at 998 ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."). Here, the only information that was needed to make Thornburg's comment about the Alt-A mortgage market not misleading was that Thornburg actually had direct exposure to that market; more detailed information was not necessary or required. Though the Plaintiffs stress the distinction between the assets contained in Thornburg's two accounting categories—loans that were *both* underwritten and securitized by *third-parties* compared to loans underwritten or securitized (or both) by Thornburg itself—the securities laws do not make that type of fine-grain disclosure necessary to make Thornburg's statement not misleading. The statement did not mention third-party mortgages compared to

---

[7](...continued)
"purchased ARM assets." As of June 30, 2007, around $31.8 billion in assets were categorized as ARM loans and around $24.7 billion in assets were categorized as purchased ARM assets. Supp. App. 705. The $2.9 billion in purchased MBS backed by Alt-A loans was contained within the purchased ARM assets category.

Thornburg mortgages, and thus parsing such differences in its disclosures was unnecessary. Accordingly, we conclude Thornburg made no misleading statement in its September offering documents.

Given our conclusion that the statement was not misleading, there is no need to consider whether omission of the $2.9 billion in Alt-A MBSs from the September offering documents was material. The Plaintiffs have failed to state a claim.

### 3. Duty to Disclose in the September Offering - Regulation S-K

As an alternative basis for § 11 liability, the Plaintiffs argue that Item 303 of Regulation S-K required Thornburg (and its underwriter, FBR) to disclose in the September prospectus its portfolio of purchased Alt-A MBSs. The Plaintiffs contend Thornburg was under such a duty because the decline in the Alt-A and subprime mortgage markets was likely to have an adverse effect on Thornburg's liquidity and income. *See* 17 C.F.R. § 229.303(a)(1), (a)(3)(ii) (requiring disclosure of known market trends affecting liquidity and income). By contrast, FBR, the sole underwriter of Thornburg's September offering, relies on an accompanying instruction to the regulation to escape liability, arguing that omission of the $2.9 billion in MBSs did not make the reported financials any less "indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3.

The district court agreed with FBR and so do we. The Plaintiffs have not alleged sufficient facts to demonstrate that Thornburg was under an obligation to disclose the existence of the $2.9 billion in MBSs. The September prospectus already warned investors that (1) Thornburg had been forced to sell $20.5 billion of its AAA-rated MBSs at a loss, Supp. App. 1245; (2) Thornburg had been cut off from two of its three sources of funding, *id.* at 1244; and (3) liquidity conditions could worsen, *id.* at 1247. Given these disclosures, more specific information concerning the $2.9 billion in purchased Alt-A MBSs (out of over $30 billion in "Purchased ARM Assets") would not have better illumined Thornburg's financial future "in any material way." 17 C.F.R. § 229.303(a)(1). Prospective investors knew that the prices of Thornburg's ARM assets had dropped due to turmoil in the housing market and that continued turmoil would hurt both its liquidity and revenue.

The Plaintiffs have not offered a convincing argument why the $2.9 billion in *purchased* MBSs backed by Alt-A loans were materially different from Thornburg's other Alt-A holdings—which were explicitly disclosed under the "ARM loans" category in Thornburg's financial statements. The Plaintiffs contend that, because the Alt-A loans underlying the $2.9 billion in question were both securitized and underwritten by third parties, these loans were materially different from ones that were underwritten or securitized (or both) by Thornburg. As the basis for the difference between the two categories, the Plaintiffs claim

-24-

Thornburg and its subsidiaries represented that they maintained strict underwriting and securitization guidelines whereas the third parties did not.

Yet Thornburg's SEC filings undermine this claim. Thornburg clearly represented in its SEC filings that it also had "case-by-case" underwriting exceptions, just like the third-party originators supposedly had. Supp. App. 235. Thornburg allowed such exceptions based on "low loan-to-value ratios, low debt-to-income ratios, excellent credit history, stable employment, financial reserves, and time in residence at the applicant's current address." *Id.* The result of these exceptions was that, at the end of second quarter 2007, 11.1 percent of the $17.1 billion of loans that Thornburg's subsidiary originated and that Thornburg held on its books were Alt-A (*i.e.*, "stated income/no ratio"). *Id.* at 707. As a result, the Plaintiffs have not established that prospective investors would have viewed Alt-A assets originated by Thornburg any differently from those Thornburg purchased from third parties.

Decisions from other circuits support our conclusion that Thornburg did not violate Item 303 by failing to disclose the $2.9 billion in purchased Alt-A MBSs. For example, in *Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002), the Eleventh Circuit held that a pharmaceutical company did not violate Item 303 by omitting data about declining prescription volume because the prospectus already warned investors that the company had lost $80 million and

might never be profitable. *Id.* at 1192. The prospectus contained all the material information concerning the company's financial future.

By contrast, in *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), the Second Circuit held that the plaintiffs had alleged a violation of Item 303 based on a company's failure to disclose how the declining trend in the real estate market would affect its earnings, given that 22.6 percent of its assets were in real estate. *Id.* at 722. While the defendant was a portfolio company, with many different investments across various industries, it needed to disclose trends related to its major investments, including the real estate markets.

This case reflects the same conditions as in *Oxford* rather than those in *Litwin*. Thornburg informed investors in its prospectus that its sources of financing were restricted, that it had been forced to sell off billions of dollars in assets, and that the situation could worsen. Like the defendant in *Oxford*, Thornburg painted an unvarnished picture of its finances. And unlike the defendant in *Litwin*, which neglected to discuss its exposure to an entire market, Thornburg painted a materially complete picture of how it was exposed to the decline in the MBS market. Item 303 imposed no additional disclosure obligations.

### *4. Duty to Disclose in September Offering - Regulation S-X*

As a final basis for Thornburg's § 11 liability for omitting the $2.9 billion in Alt-A MBSs, the Plaintiffs contend Thornburg violated Regulation S-X in its

September offering. Regulation S-X requires all offering documents to be in compliance with GAAP; and the pertinent standard here, FAS 107, obligates companies to disclose significant concentrations of credit risk.

The sole underwriter of the September offering, FBR, does not dispute this requirement but contends that to "state a claim that an entity's failure to disclose a concentration of credit risk violated FAS 107, a plaintiff must plead facts that would permit findings that the entity in fact had 'significant concentrations of credit risk' and that the entity *believed that to be so*." FBR Br. at 57 (emphasis added) (quoting *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 291 (S.D.N.Y. 2011)). This knowledge requirement stems from the recognition that whether a particular asset constitutes a significant concentration of risk is a matter of judgment. *See* FASB Staff Position SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk*, at ¶ 7 (2005) ("Judgment is required to determine whether loan products have terms that give rise to a concentration of credit risk."). A company, or its auditor, has not exercised "judgment" in deciding whether to disclose a significant credit risk if it never realized (or never consciously ignored signs) that it was exposed to the risk in the first place.

The Plaintiffs do not contest the rule advanced by FBR—that they must allege facts sufficient to raise an inference that Thornburg believed it had a significant concentration of risk in its $2.9 billion of purchased MBSs backed by

Alt-A loans. Rather, they insist they have alleged the requisite facts. For two reasons, we disagree.

First, the September prospectus demonstrates that Thornburg was concerned about the overall MBS market. The decline in its MBS assets had triggered margin calls and forced Thornburg to sell over $20 billion of its highest-rated assets. Thornburg was concerned this trend would continue and warned investors about this possibility. The Plaintiffs have put forward no allegations that Thornburg saw its MBSs backed by Alt-A loans as significantly more risky than its other MBSs, such that it needed to make additional disclosures.

Second, given the relatively small role the purchased MBSs backed by Alt-A loans figured in the overall portfolio, no inference is raised from the assets' mere existence that Thornburg saw them as (or consciously ignored the possibility they were) a significant concentration of credit risk. Accordingly, the Plaintiffs have not pleaded facts demonstrating Thornburg violated its disclosure obligations under Regulation S-X.

Given our conclusion that Thornburg had no duty to disclose the $2.9 billion in MBSs, under either Regulation S-K or S-X, we need not consider whether the omission was material.

### C. *Disclosure of Cross-Default Provisions*

The Plaintiffs' second non-disclosure argument contends Thornburg violated § 11 by failing to disclose in the September offering the cross-default

provisions in Thornburg's repurchase agreements.  The Plaintiffs advance multiple theories of liability.

### 1.  Misleading Statement in the September Offering

As an initial matter, the Plaintiffs contend that Thornburg made a material omission by failing to include in its September offering documents a disclosure that its repurchase agreements contained cross-default provisions.  The result of these provisions was that a default on any one of the agreements triggered a default on all of them.  The Plaintiffs contend that this omission made misleading the following statement:

> Because we borrow money under Reverse Repurchase Agreements . . . based on the fair value of our ARM Assets, our borrowing ability under these agreements could be limited and lenders could initiate margin calls in the event of interest rate changes or if the value of our ARM Assets declines for other reasons.

Supp. App. 703.

Yet the Plaintiffs cannot show how the omission of the cross-default provisions made the statement misleading.  The statement merely mentions Thornburg's dependence on repurchase agreements to borrow money and that a decline in the value of their ARM assets could trigger a margin call.  There is no mention about the possibility of failing to meet a margin call or its consequences. Default, let alone cascading default, is an entirely different subject that is not even broached in the statement.  Because the statement gives no impression, one

-29-

way or the other, about the effect on the company of failing to meet a margin call, there is no basis for believing the statement was misleading.

Given our conclusion that the statement was not misleading, we need not consider whether the omission was material.

### 2. Duty to Disclose in the September Offering - Regulation S-K

The Plaintiffs also argue that Thornburg had an obligation to disclose the cross-default provisions under Item 303 of Regulation S-K, which requires, among other things, disclosure of known trends or uncertainties that are reasonably likely or are reasonably expected to affect a company's liquidity or earnings. 17 C.F.R. § 229.303(a)(1), (a)(3)(ii). FBR contends that the Plaintiffs have failed to plead sufficient knowledge for a violation of Item 303. Subsection (a)(1) requires allegations that the cross-default provisions were "reasonably likely" to be triggered, thereby harming Thornburg's liquidity, and subsection (a)(3)(ii) requires allegations that Thornburg "reasonably expect[ed]" the cross-default provisions to have an adverse impact on its earnings.

We agree with FBR that the Plaintiffs have failed to allege the necessary facts. The state of the mortgage market as of the September offering does not raise an inference that there was a reasonable likelihood the cross-default provisions in Thornburg's repurchase agreements would be triggered due to an unprecedented slump. *Cf. Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) ("The subprime market had been in decline

-30-

during the first half of 2007, but that did not necessarily imply a continuing slump, let alone a collapse.  For every seller of subprime loans in 2007 who thought them overpriced, there was a buyer who expected to make a profit when the market went back up." (citing academic articles on the subprime credit crisis)).

The Plaintiffs provide no allegations raising the inference that Thornburg knew the cross-default provisions were reasonably likely to be triggered.  The complaint itself refers to the fact that Thornburg had been able to meet its margin calls up to then.  Only if the prime and subprime mortgage markets collapsed at the same time would the value of Thornburg's collateral decline to such an extent that the size of the margin calls would raise the specter of default, thereby triggering the cross-default provisions.  Notwithstanding cautionary language in the prospectus about the future of the mortgage market, nothing in the complaint suggests Thornburg should have seen this catastrophic collapse as a reasonable likelihood (rather than a mere possibility) at the time of the September offering.  Accordingly, Thornburg had no obligation under Item 303 to disclose the existence of the cross-default provisions.

Given our conclusion that Thornburg had no duty to disclose the cross-default provisions under Regulation S-K, we need not consider whether the omission was material.

### D. *Restatement of Financials*

As the third and final basis for liability, the Plaintiffs argue that the May, June, and September offering documents were materially misleading because they incorporated Thornburg's 2006 financial statement, which allegedly contained material misstatements. This claim stems from a letter by KPMG, Thornburg's outside auditor, which, on March 4, 2008, stated that Thornburg's 2006 and 2007 annual statements "contain material misstatements associated with available for sale securities." App. 119. Such misstatements, if true, would be violations of GAAP; and, as already noted, companies whose offering documents are not in compliance with GAAP are in violation of Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), thus potentially leading to liability under § 11 of the Securities Act. The Plaintiffs do not point to any specific misstatements, but rely only on KPMG's disclosure that the 2006 and 2007 statements contain material misstatements.

The reality, though, is that KPMG approved Thornburg's 2006 financials. Following the release of the March 4 letter, Thornburg restated its 2007 financials, but left untouched its 2006 financials. In response, KPMG wrote a letter, dated March 7, stating that it had reviewed Thornburg's restatements and "we agree with such statements." Supp. App. 884. The district court concluded, and the Underwriters argue here, that this letter was an implicit approval of both the original 2006 financials and the restated 2007 financials. The Plaintiffs

-32-

contend that this inference is an impermissible evaluation of the facts, and that there is an alternate, equally plausible interpretation of KPMG's March 7, 2008 letter—that KPMG still thought the 2006 financials were misleading.

Yet any ambiguity in the March 7 letter is cleared up in an auditing statement included with Thornburg's refiling of its 2007 10-K statement on March 11, 2008. In that statement, KPMG says it has "audited the accompanying consolidated balance sheets . . . as of December 31, 2007 and 2006" and determined that they "present fairly, in all material respects, the financial position of Thornburg," and that the statements were "in conformity with U.S. generally accepted accounting principles." Supp. App. 538. The statement is dated February 27, 2008 "except as to Notes 1, 2, and 13, which are as of March 9, 2008." *Id.* at 539. In Notes 1 and 2, KPMG explains that the basis of Thornburg's 2007 restatement was the proper valuation of certain MBS assets that would have to be sold to meet margin calls. *Id.* at 545–46. There is no mention of the 2006 financials, nor any other indication that their contents were misleading. The 2006 financials were only included in the 2007 10-K statement, as is customary, to provide a point of comparison. *Cf. Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1170 (10th Cir. 2006) (referring to similar auditing language as "standard language of the profession"). Given this practice of automatically grouping the past two years together, it is highly unlikely that KPMG would have remained silent after

-33-

Thornburg's correction if its accountants thought the 2006 financials were problematic.

KPMG's statements, along with Thornburg's decision not to restate its 2006 financials, conclusively defeat any claim that relies solely on the March 4 KPMG letter. Because the Plaintiffs do not make any additional allegations concerning Thornburg's 2006 financial statements, the Plaintiffs have not adequately alleged an actionable misrepresentation or omission to state a § 11 claim.

## III. Conclusion

The Plaintiffs have not alleged sufficient facts demonstrating Thornburg made an actionable misrepresentation or omission at the time of its stock offerings. As a result, they have not stated a § 11 Securities Act claim against any of the Underwriters. Accordingly, we AFFIRM the district court's dismissal.