Patrick R. McDONALD and James P. Rode, Plaintiffs–Appellants,

v.

KINDER–MORGAN, INC., formerly known as KN Energy, Inc., Defendant–Appellee.

No. 01–1139.

United States Court of Appeals, Tenth Circuit.

April 23, 2002.

William F. Demarest, Jr., Shook, Hardy & Bacon, L.L.P., Washington, D.C.; Gary C. Davenport, McGloin, Davenport, Severson and Snow, P.C., Denver, CO, for Plaintiffs–Appellants.

Michael L. Beatty, Susan E. Chetlin, Michael Noone, The Beatty Law Firm, P.C., Denver, CO, for Defendant–Appellee.

Before LUCERO and MURPHY, Circuit Judges, and ALLEY, Senior District Judge.*

* The Honorable Wayne E. Alley, Senior District Judge, Western District of Oklahoma, sitting

MURPHY, Circuit Judge.

After examining the briefs and appellate record, this panel determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). Accordingly, on December 28, 2001, we granted Appellants' Motion to Submit Appeal on the Briefs and ordered the case submitted without oral argument.

Patrick McDonald and James Rode brought suit against Kinder Morgan, Inc. ("KM") and several KM officers asserting claims under the Securities Exchange Act of 1934 (the "Act") and its implementing regulations. They asserted that statements in KM's[1] third quarter 10–Q describing increased revenue and operating income flowing from KM's acquisition of a natural gas processing plant imposed a duty on the defendants to further disclose potential financial risks associated with "keep whole" contracts to which that plant was subject. The district court granted KM's Fed.R.Civ.P. 12(b)(6) motion to dismiss, holding that the statements in the 10–Q relied on by McDonald and Rode were accurate reports of historical fact and that the disclosure of such facts did not create a duty to disclose the "keep whole" contracts.[2] McDonald and Rode appeal. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms.**

The following recitation of facts is drawn from the well-pleaded allegations set out in McDonald's and Rode's first amended complaint. *See Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488, 1496 (10th

Cir.1995). KM is an integrated energy company with operations that include gathering, processing, marketing, storage, and transportation of natural gas and natural gas liquids. On December 19, 1997, KM merged with Interenergy Corp. ("IEC"), a natural gas gathering, processing, and marketing company. McDonald and Rode owned approximately 35% of the issued and outstanding shares of IEC at the time of the merger. As consideration for the merger, holders of IEC stock received shares of KM stock. Each share of IEC stock was converted into a fixed number of KM shares pursuant to an exchange ratio based on the average of the daily closing price of KM stock during a specified twenty-day period prior to the merger. It is the conversion formula that is at the heart of this lawsuit. McDonald and Rode assert that the price of KM shares was artificially inflated, resulting in their receipt of fewer shares of KM stock under the conversion formula, by omissions from KM's 1997 Third Quarter 10–Q. In particular, McDonald and Rode assert that KM failed to disclose the existence of risky "keep whole" contracts to which it was subject as a result of its then-recent acquisition of a large natural gas processing plant (the "Bushton Plant").

KM purchased the Bushton Plant nine months prior to the KM/IEC merger. The Bushton Plant processes natural gas to remove liquid and liquefiable hydrocarbons ("NGLs"), which are sold separately from natural gas.[3] Approximately 33% of the natural gas processed at Bushton is owned by third parties and subject to

---

by designation.

**1.** At the time of the events in question, KM was named KN Energy, Inc. For ease of reference, this court will refer to the defendant entity as KM throughout this opinion.

**2.** Thereafter, the parties stipulated to the dismissal with prejudice of all claims against the

individual defendants. Accordingly, the only claims at issue in this appeal are McDonald's and Rode's claims against KM.

**3.** It is clear that the operation of the Bushton Plant is material to KM's overall fiscal health; forty percent of KM's total processing volume is attributable to the Bushton Plant.

"keep whole" contracts. KM processes natural gas for these third parties in exchange for being allowed to retain the NGLs in the natural gas. KM must, however, agree to "keep whole" these third parties for the reduction in the energy content of the natural gas stream associated with the removal of the NGLs. "Keep whole" contracts affect the cost of operation of a processing plant by requiring the processor (KM in the case of the Bushton Plant) to replace the British thermal units ("Btus") of the NGLs removed from the gas stream with an equivalent number of Btus of processed gas. As long as the value of the Btus of the NGLs is greater than the value of the replacement Btus of gas supplied by the processor under "keep whole" contracts, the plant's processing activities may be profitable. The risk in "keep whole" contracts is the possibility of a price inversion, a market situation where the value of the replacement Btus of natural gas supplied under the "keep whole" contract will exceed the value of the Btus of the NGLs removed from the gas stream. Such a price inversion occurred in 1998, shortly after the KM/IEC merger, causing KM to suffer millions of dollars of losses at the Bushton Plant and causing its stock price to fall precipitously.

On November 12, 1997, before the KM/IEC merger became effective and before the start of the twenty-day measurement period for determining how many shares of KM stock would be exchanged for IEC stock, KM issued its quarterly report for the third fiscal quarter of 1997 (the "10-Q"). In that report, KM stated that its earnings were positively affected in the third quarter by operations at the Bushton Plant. The 10-Q did not reference the "keep whole" contracts to which the Bushton Plant was subject or note the financial risks associated with such contracts if a price inversion was to occur.

In its 1998 10-K Annual Report, issued in 1999, KM disclosed the existence of Bushton's "keep whole" contracts and the significant commodity risks associated with these contracts. In fact, KM disclosed that corporate operating expenses had increased by $77.2 million more than operating revenues, primarily due to the negative effect of the "keep whole" contracts. These disclosures by KM, however, came only after independent financial analysts disclosed the problems with KM's "keep whole" contracts to the investing public and the stock acquired by McDonald and Rode through the merger had fallen drastically.

After the disclosure of the revenue problems associated with the Bushton "keep whole" contracts, and the concomitant drop in the share price of KM, McDonald and Rode filed a complaint alleging that the failure to disclose the existence of the "keep whole" contracts in the 10-Q violated the Act and its implementing regulations. The complaint quoted and emphasized, at paragraph 30, the following language from the 10-Q:

The significant increases in the 1997 operating revenues, costs, and expenses largely reflect the contributions of the Bushton-related assets acquired on April 1, 1997, and power marketing activities. **The Bushton acquisition provided incremental 1997 third quarter and nine months operating revenues of $35.4 million and $71.5 million and operating income of $5.1 million and $10.6 million, respectively.** However, certain power marketing transactions were structured in a way that was not in compliance with the Company's **risk management policies,** and losses of $4.0 million were incurred. Power marketing activities have been suspended until the Company either owns, or has a pow-

er marketing partner that owns, electric generating assets.

With regard to this language in the 10–Q, McDonald and Rode alleged as follows:

These statements are incomplete and, therefore, materially misleading because, while addressing certain risks, *i.e.,* those related to the Company's power marketing activities, they do not disclose the existence of the significant risks associated with the Bushton-related "keep whole" contracts while reporting the incremental operating revenue and operating income attributable to the operation of the Bushton Plant.

In response to McDonald's and Rode's first amended complaint, KM filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) asserting that the statements in the 10–Q set out in the complaint were not actionable. At a hearing on the motion to dismiss, the district court began by noting that it was inclined to grant the motion to dismiss without allowing leave to amend. In response, McDonald and Rode asserted repeatedly that their complaint rose or fell on the 10–Q. They also quoted during the

hearing additional statements from the 10–Q which they argued supported their claim that KM's assertions regarding increased revenues and profits flowing from the Bushton acquisition created a duty to disclose the "keep whole" contracts.[4] At the conclusion of McDonald's and Rode's arguments at the hearing, the district court granted KM's motion to dismiss, concluding that the statements identified in the 10–Q were not actionable as a matter of law. In ruling from the bench, the district court stated as follows:

With respect to the 10–Q, I do not see—*I still disagree, notwithstanding the [additional] quotations from the 10–Q, that this is anything other than an accurate statement of historical results, even when the ... Bushton language ... is included.*

And the accurate disclosure of purely historical results does not give rise to a duty to disclose the keep-whole contracts in order to make the disclosure of past financial data not misleading.

·As acknowledged [by McDonald and Rode], the stated revenues in the 10–Q

---

**4.** In this regard, McDonald and Rode argued as follows:

The 10–Q is referenced within the Complaint, and a specific connection is outlined in which the Complaint recites at paragraph 30, that [KM] in its Q advertised the Bushton acquisition as a significant asset of the company, a significant value to the company, and in fact devoted several entries on several pages within the Q as to the actual value of this facility.

The Bushton facility, for instance, is described at great detail, showing the volume of gas processed, showing the lease payments made by a [KM] subsidiary to the Bushton—or as to the Bushton facility for this processing.

The 10–Q, again, published prior to the merger states that third quarter 1997 earnings were positively impacted by contributions from the Bushton-related assets acquired on April 1; 1997.

. . . .

On page 7 of the Q, the company states "In March of 1997, [KM] completed its purchase of several Enron Corporation subsidiaries [that] owned or operated the Bushton natural gas processing facility located in Ellsworth County, Kansas and other Hugoton Basin gathering assets located in Kansas and Oklahoma. The Bushton facility processes approximately 825 million cubic feet of natural gas and produces 1.2 *million gallons of natural gas liquids, NGLs*"—the very topic of the keep-whole contracts—"and approximately 1 million cubic feet of crude helium per day. The gathering assets gather approximately 475 million cubic feet per day of natural gas through approximately 2,200 miles of pipeline."

The Q then goes on to say, "A wholly owned subsidiary of [KM] leases the processing facilities at Bushton under operating leases requiring semi-annual payments averaging $23.1 million per annum," and then elaborates on that.

are conceded to be true. The argument is that the disclosure of the Bushton revenue obligated [KM] to disclose the existence of the risks involved with the keep-whole contract[s].

In part I rely on the District of Massachusetts decision in [*In re Boston Technology Securities Litigation,* 8 F.Supp.2d 43 (D.Mass.1998)]. In that case the 10–Q disclosed that North American revenues were slightly below the previous year's corresponding quarter. The plaintiffs there argued that the reference to North American revenues obligated the defendants to disclose the existence of an alleged impending decline and the factors behind it.

The Massachusetts court disagreed, holding that the comment which concerned only past financial results is not alleged to have been false.

Accurate reports of historical fact are not actionable even where future prospects or current conditions are less favorable. And in part the Court relied on the [First] Circuit's decision in [*Gross v. Summa Four, Inc.,* 93 F.3d 987 (1st Cir.1996)].

I'm persuaded by that. I understand that the Massachusetts ruling is not binding, but I'm persuaded by that reasoning. And I agree that under *Gross,* [KM] was not under a duty to disclose the keep-whole contracts simply because it reported accurate historical facts about Bushton revenues.

In response to the district court's grant of KM's motion to dismiss, counsel for McDonald and Rode engaged in the following colloquy with the district court:

[Counsel]: Your Honor, just a bookkeeping issue with regard to the—if there is an appeal in [this] case.

The Court: All right.

[Counsel]: I would like to move the Court that the Complaint be deemed to include those elements of the Q that I cited in my argument, that is, the Bushton operations, so that we don't end up going up and down and up again.

As I understand the Court's ruling, it is that if those were there, it wouldn't do the trick.

The Court: Right.

[Counsel]: And I would like to move, then, that the Complaint be deemed to include those elements for purposes of any appellate remedy.

. . . .

The Court: All right. As far as I'm concerned, that's part of the ruling. And so for purposes of appellate review, those—the Complaint will be deemed to have been amended to reflect your oral argument.

McDonald and Rode now bring this appeal, asserting that the district court erred in concluding that their first amended complaint failed to state a claim.

■■■ This court reviews *de novo* a district court's dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6). *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997). We will affirm a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Id.* (quotation omitted). On appeal, this court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Id.* (quotation omitted). Although dismissals pursuant to Fed.R.Civ.P. 12(b)(6) are often difficult to obtain in securities cases, this court does "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *Id.*

McDonald's and Rode's arguments on appeal have two aspects. First, they reassert the arguments made before the district court that KM's references in the 10–Q to the Bushton operations imposed upon it a duty to disclose the existence of the "keep whole" contracts. Second, they assert that the following statement in the 10–Q, a statement never identified by McDonald and Rode before the district court, imposed a duty on KM to disclose the existence of the "keep whole" contracts: "The Company uses energy financial instruments to minimize its risk of price changes in the spot and fixed price natural gas and NGLs markets." This court agrees, for substantially those reasons stated by the district court, that the references in the 10–Q regarding the Bushton operations and the increased revenues and profits flowing from those operations are not actionable as a matter of law. We further conclude that McDonald and Rode waived their arguments relating to the language in the 10–Q regarding the use of energy financial instruments by not raising them before the district court.

This court can easily dispose of McDonald's and Rode's assertion that KM's failure "to disclose material information regarding the risks posed by the 'keep whole' contracts at the Bushton Plant" rendered the statements in the 10–Q "incomplete and misleading." "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *In re Boston Tech.*, 8 F.Supp.2d at 53. McDonald's and Rode's complaint fails to state a claim both because the statements in the 10–Q identified in the complaint are immaterial and because the omitted information regarding the "keep whole" contracts does not alter the meaning of the statements set out in the 10–Q.

A statement is material only if "a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman,* 120 F.3d at 1119. It is well-established that the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future. *See, e.g., In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 538 (3d Cir.1999); *Gross,* 93 F.3d at 994–95; *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1202 (1st Cir.1996); *In re Boston Tech.,* 8 F.Supp.2d at 54; *In re Exabyte Corp. Sec. Litig.,* 823 F.Supp. 866, 870 (D.Colo.1993); *Alfus v. Pyramid Tech. Corp.,* 764 F.Supp. 598, 602 (N.D.Cal.1991). "The rationale behind the rule is, of course, tied to the concept of materiality—it would be unreasonable for someone to take a report strictly concerned with the past as a representation about the future, and therefore such a report is per se immaterial to the investment decision." *In re Boston Tech.,* 8 F.Supp.2d at 54. Because McDonald and Rode conceded below that all of the statements they identified in the 10–Q were accurate recitations of historical successes, they are immaterial and not actionable as a matter of law.

Furthermore, the failure to disclose the risks associated with the "keep whole" contracts did not make the statements in the 10–Q referenced in McDonald's and Rode's complaint any less true than they would have been had KM decided to volunteer that information. For instance, disclosing that information adds nothing to the truthfulness or accuracy of the fact that KM acquired the Bushton Plant or the statements about the level of activities at the Plant. Likewise, the omitted information does not affect the truthfulness or accuracy of the information in the 10–Q regarding how the Bushton Plant performed financially in the third quarter of

1997. Accordingly, even assuming the statements identified in the 10–Q were material, the first amended complaint would still fail to state a claim because the omitted information regarding the "keep whole" contracts does not alter the accuracy of the information actually disclosed in the 10–Q.

■ For the first time on appeal, Rode and McDonald identify language in the 10–Q relating to the use of hedging contracts to "minimize [ ] risk of price changes in the natural gas and NGLs markets" and assert that without disclosure of the "keep whole" contracts, this language is materially misleading. It is clear in this circuit that absent extraordinary circumstances, we will not consider arguments raised for the first time on appeal. *See Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 814 n. 22 (10th Cir.1995). This is true whether an appellant is attempting to raise "a bald-faced new issue" or "a new theory on appeal that falls under the same general category as an argument presented at trial." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722 (10th Cir.1993). "We have therefore repeatedly stated that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory." *Id.* at 721.

This court has closely reviewed the record and concludes that this particular issue or theory was never presented below. Nevertheless, McDonald and Rode assert that the district court's oral ruling amending the complaint to include portions of the 10–Q referenced at oral argument on the motion to dismiss should be read as encompassing this newly identified statement from the 10–Q. The record does not support this assertion. The hearing on the motion to dismiss focused exclusively on those comments in the 10–Q relating to the financial performance of the Bushton Plant. Each of the additional statements from the 10–Q identified by McDonald and Rode at the hearing related to their claim that by trumpeting the success of the Bushton Plant, KM became obligated to point out the risks to future revenue streams. There is simply no hint of this alternative theory that KM was obligated to disclose the existence of the "keep whole" contracts in light of its assertion that it was hedged against price shocks in the natural gas and NGLs markets. Because McDonald and Rode have not identified any extraordinary circumstances that would justify taking up this issue for the first time on appeal,[5] we decline to address the issue. *See id.* (discussing exceedingly narrow set of "unusual circumstances" where this court has considered issues that were not raised before the district court).[6]

The judgment of the United States District Court for the District of Colorado is hereby **AFFIRMED.**

■

5. Furthermore, because McDonald and Rode have explicitly disclaimed any such argument, we do not reach the question of whether SEC Rule 303, 17 C.F.R. § 229.303, which requires a discussion and analysis of financial conditions and results of operations, might have created a duty to disclose the "keep whole" contracts and afforded McDonald and Rode a private right of action arising out of noncompliance with that duty to disclose.

6. In the alternative, McDonald and Rode assert that if this court declines to consider this new issue for the first time on appeal, the appropriate remedy is to remand to the district court so that they can amend their complaint to raise the issue. Unfortunately, their assertion that such a course is appropriate is not supported by a single citation to authority. We see no reason to provide McDonald and Rode yet another chance to amend their complaint at this late date.