**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED FOOD AND COMMERCIAL
WORKERS UNION LOCAL 880
PENSION FUND, individually and on
behalf of all others similarly situated,

     Plaintiff - Appellant,

v.

CHESAPEAKE ENERGY
CORPORATION; AUBREY K.
MCCLENDON; MARCUS C.
ROWLAND; MICHAEL A. JOHNSON;
RICHARD K. DAVIDSON; FRANK A.
KEATING; BREENE M. KERR;
CHARLES T. MAXWELL; DONALD L.
NICKLES; FREDERICK B.
WHITTERMORE; MERRILL A.
MILLER, JR.,

     Defendants - Appellees,

and

UBS INVESTMENT BANK; ABN
AMRO; BANC OF AMERICA
SECURITIES LLC; WELLS FARGO
SECURITIES,

     Defendants.

No. 13-6165
(D.C. No. 5:09-CV-01114-D)

_____

**ORDER**
_____

Before **HARTZ**, **EBEL**, and **GORSUCH**, Circuit Judges.
_____

This matter is before us on appellant's *Petition for Rehearing and Rehearing En Banc*. We also have a response from the appellees and the reply filed via our order dated October 3, 2014. Upon consideration, the request for panel rehearing is denied by the panel assigned to this appeal originally. All of the pleadings were also forwarded to all of the active judges of the court who were not recused. As no member of the original panel or any active judge called for a poll, the petition for en banc rehearing is likewise denied.

The panel has, however, *sua sponte* made one small amendment to the original opinion at page 18. The amended version of the decision is attached to this order. The clerk is directed to file the amended version *nunc pro tunc* to the original filing date of August 8, 2014.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

August 8, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED FOOD AND COMMERCIAL
WORKERS UNION LOCAL 880 PENSION
FUND, individually and on behalf of all
others similarly situated,

     Plaintiff - Appellant,

v.

CHESAPEAKE ENERGY CORPORATION;
AUBREY K. MCCLENDON; MARCUS C.
ROWLAND; MICHAEL A. JOHNSON;
FRANK A. KEATING; BREENE M.
KERR; CHARLES T. MAXWELL;
DONALD L. NICKLES; FREDERICK B.
WHITTERMORE; MERRILL A.
MILLER, JR.,

     Defendants – Appellees,

and

UBS INVESTMENT BANK; ABN
AMRO; BANC OF AMERICA
SECURITIES LLC; WELLS FARGO
SECURITIES,

     Defendants.

No. 13-6165

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:09-CV-01114-D)

Steven F. Hubachek (Eric Alan Isaacson and James I. Jaconette, with him on the briefs), Robbins Geller Rudman & Dowd LLP, San Diego, California, for Plaintiff - Appellant.

Robert P. Varian (Kenneth Herzinger, M. Todd Scott, Christin J. Hill, and Alexander K. Talarides, with him on the brief), Orrick, Herrington & Sutcliffe LLP, San Francisco, California, for Defendants - Appellees.

Before **HARTZ**, **EBEL**, and **GORSUCH**, Circuit Judges.

**HARTZ,** Circuit Judge.

In 2008 Chesapeake Energy Corporation was one of the largest producers of natural gas in the United States, with thousands of wells in several states. By early July of that year the price of natural gas had risen to its highest level since the end of 2005 and Chesapeake's stock price had risen about 50% in the prior six months. Against that background, on July 9, 2008, Chesapeake sold 25 million shares of common stock in a public offering.

Soon thereafter, a financial crisis rocked the global economy. The New York Stock Exchange Composite Index—tracking the exchange where Chesapeake was listed—fell more than 30% in the three months after the Chesapeake offering. Chesapeake was hit even harder, with sharp drops in the prices of natural gas and Chesapeake's stock.

2

United Food and Commercial Workers Union Local 880 Pension Fund (Plaintiff), representing the class of all persons who purchased securities in the offering, contends that Chesapeake and named individual defendants (collectively Chesapeake), violated §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77*o*, because the Registration Statement for the offering was materially false and misleading. (Plaintiff also raised claims against other defendants associated with the underwriting of the offering.) According to Plaintiff, Chesapeake should have disclosed (1) that it had expanded a risky gas-price hedging strategy that made it vulnerable to a fall in natural-gas prices, and (2) that CEO Aubrey McClendon had pledged substantially all his company stock as security for margin loans and lacked the resources to meet margin calls. The district court granted summary judgment for Chesapeake. On June 21, 2013, the court dismissed the claims against the underwriter defendants without prejudice and granted a joint motion for entry of judgment under Fed. R. Civ. P. 54(b) as to Chesapeake. Plaintiff appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm because Chesapeake's alleged omissions were not material or misleading.

## I. BACKGROUND

Chesapeake was the country's third-largest producer of natural gas at the time of the offering. It produced billions of cubic feet of natural gas each day and had trillions of cubic feet of reserves. Its strategy was to focus on the discovery, acquisition, and development of natural gas in the United States. Before the offering the company had

3

increased production every year for 18 years, and in the first quarter of 2008 it had drilled hundreds of new wells.

The stock offering was on July 9, 2008. Information about Chesapeake and the details of the offering were set forth in the Registration Statement, which included a prospectus and incorporated by reference some of Chesapeake's recent filings with the Securities and Exchange Commission (SEC). Chesapeake sold 25 million shares of common stock in the offering.

Natural-gas prices had been rising steeply. From December 31, 2007, to July 3, 2008, less than a week before the offering, the price had moved from $7.483 per million btu (British thermal units) to $13.577. Unsurprisingly, Chesapeake's stock price had also risen. In the six months preceding the offering its stock price had increased by almost half. But the upward trends sharply reversed after the offering. In three months the price of natural gas fell about 45%, an index of stock in Chesapeake's industry peers fell 56% , and Chesapeake's stock fell about 70%.

This suit originated in 2009 when various parties filed complaints against Chesapeake and its investment bankers in the Southern District of New York. The district court consolidated the lawsuits and appointed Plaintiff to represent the class. Plaintiff filed its amended complaint on September 11, 2009. On Chesapeake's motion, the case was transferred a month later to the Western District of Oklahoma. Chesapeake moved for summary judgment on December 28, 2011.

The district court granted Chesapeake's motion. It ruled (1) that the Registration Statement "disclosed in detail the risks associated with Chesapeake's hedging strategy," Order at 22, *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, No. CIV-09-1114-D (W.D. Okla. Mar. 29, 2013), (2) that Chesapeake had adequately disclosed that McClendon had pledged most of his shares as collateral, and (3) that additional disclosure about his financial resources was "beyond the scope of that which is reasonable because it requires speculation about unpredictable future events that could not be ascertained at the time of the Offering," *id.* at 34.

## II.    DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011) (internal quotation marks omitted). Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Merrifield*, 654 F.3d at 1077 (internal quotation marks omitted). "We can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Id.* (brackets and internal quotation marks omitted).

### A.    The Applicable Statutes

5

Plaintiff alleges violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Section 11 imposes liability on certain persons[1] "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Plaintiffs "need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). "A statement is material only if a reasonable investor would consider it important in determining whether to buy or sell stock." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (internal quotation marks omitted). Aside from disclosures required by regulation, "[a] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the

---

[1] Persons subject to liability include:

> (1) every person who signed the registration statement; (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner; (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).

statement in that it alters the meaning of the statement." *Id.* (brackets and internal quotation marks omitted). An omission is material only if disclosure of what is omitted would "significantly alter[] the total mix of information available." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). Although the question of materiality is "usually reserved for the trier of fact, we do not hesitate to dismiss securities claims . . . where the alleged misstatements or omissions are plainly immaterial." *Id.* (internal quotation marks omitted).

Section 12(a)(2) similarly imposes liability on any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). The definition of materiality is the same as under section 11 (and under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)), *see Morgan Stanley*, 592 F.3d at 360, and the plaintiff, as with section 11, need not "allege scienter, reliance, or loss causation," *id.* at 359. Together, the two sections impose liability for material misstatements or omissions in a registration statement or prospectus for a stock offering. As the Second Circuit has put it:

> [T]he language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading.

*Id*. at 360.

7

Section 15 states that "[e]very person who, by or through stock ownership, agency, or otherwise, . . . controls any person liable under sections [11 and 12], shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 77*o*(a). In other words, section 15 allows "a person who controls a party that commits a violation of the securities laws" to "be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998). Section 15 claims in this action thus depend upon the success of claims under sections 11 and 12(a)(2).

Plaintiff argues that Chesapeake violated these securities laws because the materials it provided in connection with its public stock offering should have disclosed (1) that it had changed its risky hedging strategy and (2) that CEO McClendon had pledged substantially all his company stock as security for margin loans and lacked the resources to meet margin calls. We turn first to the allegations involving hedging and then those involving McClendon's margin loans. For each claim we set out additional relevant background before discussing the merits of the claim.

## B. Hedging Strategy (Knockout Swaps)

Chesapeake used a hedging strategy to manage price volatility in the market for natural gas. Hedging enables a seller to lock down how much it will earn when it sells its natural gas in the future so that it does not have to worry about dramatic fluctuations in price. Perhaps to oversimplify a bit, say Chesapeake wanted to be assured that when it sold a million Mcf (thousand cubic feet) of gas on a date 20 months in the future (the sale

8

date), it would be paid $9 per Mcf (the fixed price). It could enter into a contract (wholly separate from Chesapeake's sales of gas to customers) under which Chesapeake would receive from (or pay to) a third party (often a financial institution like Morgan Stanley or Lehman Brothers) the difference between the market price of that quantity of gas on the sale date and the cost of that quantity at the fixed price. If the market price dropped below the fixed price, Chesapeake would be protected by a payment from the third party that equaled the difference between what it was paid on the market and what it would have been paid if the market price had been $9 per Mcf. On the other hand, if the market price on the sale date exceeded $9, Chesapeake would have to pay the third party the excess of what it was paid on the market over what it would have been paid at $9 per Mcf. These contracts—called swaps—matured up to 30 months in the future. Although the swaps stabilized Chesapeake's financial position and decreased its vulnerability to fluctuations in the price of natural gas,[2] the contracts in themselves could end up costing Chesapeake money. If, as already explained, the market price exceeded the fixed price, Chesapeake had to pay the other party to the swap contract. The loss on the swap contract essentially represents how much more Chesapeake could have earned by selling gas on the market without entering into a swap contract. One could say that swaps represented bets that the price of natural gas would not exceed the fixed price.

---

[2] Swaps did not always work out as neatly as this idealized description. The Registration Statement explained that they exposed the company to additional risk in certain circumstances, such as if the other party to the swap failed to perform.

Chesapeake also entered into more complicated hedging contracts. For example, it used knockout swaps, which were like ordinary swaps except that the other party was excused from paying if the market price of natural gas fell below a certain threshold (the knockout price) on the date of maturity. The knockout price was generally set about three dollars below the negotiated fixed price. Knockout swaps provided less protection from falling prices than ordinary swaps because they did not limit Chesapeake's risk if the price of natural gas fell too far. In that event Chesapeake would be left with the market price for its natural gas. On the other hand, the other party to a swap contract would pay Chesapeake more to enter into a contract with a knockout feature because of that added risk assumed by Chesapeake. If ordinary swaps represented a bet that natural-gas prices would not exceed the fixed price, the knockout feature represented a bet that prices would not drop below the knockout price.

Chesapeake had increased its income by hundreds of millions of dollars through the use of knockout swaps. Its swaps had been "knocked out" by low natural-gas prices only four times before the offering. But when natural-gas prices fell dramatically in 2008, the knockout provision was expensive for Chesapeake. Plaintiff estimates that the losses exceeded $500 million.

The Registration Statement included general information about Chesapeake's hedging strategy. It explained that when natural-gas prices rose, its hedging strategy would be costly: "[O]ur hedging strategy allows us to predict with greater certainty the effective natural gas and oil prices to be received for our hedged production," but "can

also limit the prices we actually realize for our natural gas and oil production and therefore reduce our natural gas and oil revenues in the future." Aplt. App., Vol. II at 949. The Registration Statement also disclosed that because natural gas and oil prices had risen "dramatically" in 2008, its hedging strategy had "negatively impacted our earnings in the first quarter of 2008 during which we incurred $1.1 billion of unrealized losses." *Id.* Not predicting the imminent fall in natural-gas prices, it assumed that prices would continue to rise and said that "we anticipate incurring additional substantial unrealized losses in the quarter ended June 30, 2008, and we expect such losses could result in our reporting negative revenues from natural gas and oil sales and will result in an overall net loss for such quarter." *Id.*

Although absent from the Registration Statement itself, information about knockout swaps could be found in the SEC filings incorporated in the statement. Of those filings, the May 10-Q—a quarterly report with data through March 2008—provided the most recent disclosures about Chesapeake's knockout swaps. It listed the volume of knockout swaps Chesapeake had entered into that would mature in 2008, 2009, and 2010, and stated the average fixed price and the average knockout price for the contracts.

Plaintiff argues that Chesapeake violated securities laws when its Registration Statement did not disclose that it had entered into more knockout swaps and raised the knockout prices after it filed the May 10-Q. For specific data on the increase in knockout-swap volume and the increase in knockout prices after the May 10-Q and before the July offering, Plaintiff points to Chesapeake's August 8-K, which came out

11

after the offering. (8-Ks are forms to notify investors of certain events important to the company.) Plaintiff contends that Chesapeake's failure to disclose these changes concealed two kinds of risk: (1) more swaps with knockout provisions meant increased vulnerability to a fall in natural-gas prices; and (2) the knockout swaps were riskier than they had been in the past because they had higher knockout prices (natural-gas prices would not need to fall to as low a price before the knockout provision was triggered). According to Plaintiff, investors would have wanted to know about Chesapeake's increased emphasis on knockout swaps because "[w]hen natural gas prices hit a knockout price, the consequences are severe: the counterparty need not perform, and Chesapeake loses its hedged price." Aplt. Br. at 39. It says that once Chesapeake chose to provide information about its knockout hedging strategy by incorporating the May 10-Q, "it had a duty to be both accurate and complete." *Id.* at 38 (internal quotation marks omitted). We hold, however, that there was no violation of Chesapeake's disclosure duties. We doubt that the Registration Statement was misleading. Certainly, Plaintiff has failed to support its claim that Chesapeake changed its knockout hedging *strategy* in the second quarter of 2008.

In any event, Chesapeake had publicly disclosed before the offering the gist of what was later disclosed in the August 8-K. We look first at the Registration Statement and the documents it incorporates. Rather than indicating that the May 10-Q, a quarterly report with data through the end of March 2008, reflected what Chesapeake's hedging positions would be on July 9, 2008, the offering materials signaled that Chesapeake's

hedging commitments and the value of its hedging contracts changed substantially over time. The most recent annual report said that "[c]ommodity markets are volatile and Chesapeake's hedging activities are dynamic." Defs.-Appellees Req. for Judicial Notice at 51, *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, No. 13-6165 (10th Cir. Dec. 9, 2013). The Registration Statement itself said that Chesapeake had "incurred $1.1 billion of unrealized losses" in the first quarter of 2008 and "we anticipate incurring additional substantial unrealized losses in the quarter ended June 30, 2008." Aplt. App., Vol. II at 949. One could see the variability in hedging activity by comparing Chesapeake's most recent annual report (with data through 2007) with the May 10-Q (with data through March 2008): during the first quarter of 2008, Chesapeake had increased the volume of knockout swaps maturing in the fourth quarter of the year by 29% and its 2009 knockout swaps by 84%.

The authorities relied on by Plaintiff do not support its contention that Chesapeake's disclosures were misleading. Plaintiff cites *In re Lehman Brothers Securities & ERISA Litigation*, 799 F. Supp. 2d 258 (S.D.N.Y 2011), for the proposition that "'a statement regarding a company's hedging strategy obliges it to disclose when it alters or suspends that strategy.'" Aplt. Br. at 46 (emphasis and internal quotation marks omitted) (quoting *Lehman*, 799 F. Supp. 2d at 283). But the opinion cannot be read as saying that disclosure is required of any alteration in application of a hedging strategy that reportedly makes frequent adjustments in response to market conditions. The nondisclosure in *Lehman* was qualitatively far different from the alleged nondisclosure

13

here. The defendants in *Lehman* allegedly did not disclose that they had repeatedly entered into a particular type of financial transaction (called a "Repo 105," which we need not define) whose sole purpose was to influence a financial metric called net leverage. *See Lehman*, 799 F. Supp. 2d at 269, 283. The metric mattered to investors "because it was an indicator of the company's ability to absorb any losses sustained by its riskiest assets." *Id.* at 269. Lehman Brothers discussed net leverage in its offering materials, and company officers mentioned it in oral statements, without any disclosure that the company used short-term Repo 105 transactions at the end of each financial quarter to "temporarily and artificially" improve the net leverage announced in its quarterly reports. *Id.* at 283. In contrast, Chesapeake disclosed that it used knockout swaps and provided past financial statements that showed how the company historically used them.

Plaintiff similarly cites *Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002), as establishing that "once [Chesapeake] chose to discuss its hedging strategy, it had a duty to be both accurate and complete." Aplt. Br. at 38 (brackets omitted) (quoting *Caiola*, 295 F.3d at 331). But again Plaintiff reads too much into the court's statement. *Caiola* was not requiring disclosure of every detail of a hedging strategy. In *Caiola*, which reversed the dismissal on the pleadings of a 10b-5 claim, Citibank allegedly had agreed to perform a sophisticated type of hedging for a client but then ended the hedging without providing any notice. *See* 295 F.3d at 317–18. The client entered into trades worth millions of dollars (and paid Citibank millions in commissions) with the expectation that

14

he was protected from certain risks because Citibank was hedging his position. *See id.* at 318. The client alleged that he ultimately lost tens of millions of dollars pursuing an investment strategy that had become extremely risky when Citibank secretly terminated the hedging program. *See id.* at 319. Citibank's failure to inform its client that it had stopped hedging is a far cry from Chesapeake's failure to include the most recent information about its knockout hedges in the Registration Statement.

Moreover, almost all the change in Chesapeake's knockout-swap hedging was disclosed before the offering date in the May 8-K filed by Chesapeake with the SEC. To support its claims that the changes in the hedging were "dramatic," Aplt. Br. at 37, and "substantial[]," *id.* at 38, Plaintiff's brief compares the data in the May 10-Q with the data in the August 8-K, which showed that after the first quarter of 2008 Chesapeake increased the volume of knockout swaps and the knockout prices. In the interval between the two reports Chesapeake increased the volume of swaps maturing in the last two quarters of 2008 by 12%, the volume of swaps in 2009 by 25%, and the 2010 swaps by 61%. (The knockout prices are harder to compare because the 10-Q reports an average price while the 8-K reports a range.) Almost all these increases, however, are reported in the May 8-K. Between the May 8-K and the August 8-K the increase in volume was only 3% for 2009 swaps and there was no increase for 2010 swaps;[3] and the knockout-price

---

[3] The comparison for 2008 swaps must take into account that some swaps matured in the interim. Although the August 8-K shows a *decrease* of 26% from the May 8-K, the August 8-K reports on one fewer quarter. Neither report discloses swap volume by

Continued . . .

15

range increased by only 15% (one dollar) for 2008 swaps and 3% (25 cents) for 2009 and 2010. The disclosures in the three relevant reports are summarized in the following chart:

| | | | 2008* | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|---|---|
| Form | Filing Date | Reporting Through | Swap Volume (bbtu) | KO Price** | Swap Volume (bbtu) | KO Price** | Swap Volume (bbtu) | KO Price** |
| 10-Q*** | 5/12/08 | 3/31/08 | 186,750 | 6.22 | 280,100 | 6.13 | 109,500 | 6.13 |
| 8-K**** | 5/2/08 | 5/1/08 | 191,301 | 5.45 to 6.50 | 339,636 | 5.45 to 7.25 | 175,956 | 5.45 to 7.25 |
| 8-K**** | 8/1/08 | 7/31/08 | 141,174 | 6.45 to 7.50 | 350,889 | 5.45 to 7.50 | 175,956 | 5.45 to 7.50 |

* 2008 volumes are not for the entire year (they include the last three quarters for the May filings and the last two quarters for the August filing)
** Knockout price is reported as an average in the 10-Q and a range in the 8-K
*** The 10-Q reports quarterly volumes in 2008 as follows: 2Q-60,380; 3Q-62,560; 4Q-63,810
**** 8-Ks report in billion cubic feet (bcf), which have been approximately converted to billion btu (bbtu) by multiplying by 1,023.

Plaintiff argues that it is inappropriate to consider the May 8-K because it was not part of the offering materials. But the report is still relevant. The claim here is that Chesapeake failed to disclose material information, and "[m]ateriality . . . depends on the information that already exists in the market." *Slater*, 719 F.3d at 1197. Undisclosed information is material only if its disclosure would have "significantly altered the total mix of information available" to a reasonable investor. *Id.* (internal quotation marks omitted). Public documents are part of that total mix if an investor interested in a particular type of information about a company would know of the existence of the

quarter; but the May 8-K shows swap volumes of about 24,000 bbtu maturing per month for the rest of 2008, and the monthly average in the August 8-K is about 28,000, about a 17% increase. The monthly increase between the May 10-Q and the May 8-K was about 15%.

16

record and could readily access it. *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("The total mix of information may also include information already in the public domain and facts known or reasonably available to the shareholders." (internal quotation marks omitted)); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668–69 (2d Cir. 2009); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 372–76 & n.6 (E.D.N.Y. 2003); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656–57 (4th Cir. 2004). As *Greenhouse* observes, "[A] 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." 392 F.3d at 656. Here, the May 8-K was readily available on the SEC website, and a reasonable investor interested in Chesapeake's swap practices would know from prior 8-Ks that these disclosures provide the latest information on the subject.

We recognize that in *United Paperworkers* the court refused to consider disclosures in a 10-K not submitted to the shareholders with the proxy materials. But there were several circumstances different from what are present here. *United Paperworkers* concerned a proxy request to vote on a shareholder proposal to require the company to undertake certain environmental initiatives. *Garber*, 347 F. App'x at 669, distinguished *United Paperworkers* on the ground that it involved a proxy statement rather than a registration statement and investors would be likely to consider a wider universe of information when deciding whether to buy stock than when voting on a specific issue. *Keyspan*, 383 F. Supp. 2d at 374 n.6, further distinguished it on the

17

grounds that it predated "the explosion in Internet availability" of SEC filings and involved an affirmatively misleading representation rather than a nondisclosure. Perhaps most significantly, in *United Paperworkers* the court reasoned that "a reasonable shareholder [voting on the environmental proposal, who] had read both the Proxy Statement and the annual report would have received no indication that additional information pertinent to [the proposal] was available in the 10-K Report." 985 F.2d at 1200. In contrast, here, as mentioned above, an interested investor would have clear notice that 8-Ks would report knockout-swap activity.

Also distinguishable are the two cases cited by Plaintiff to support its view that the May 8-K should not be considered. In *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 126–27 (2d Cir. 2013), the court held that the defendant could not escape nondisclosure liability based on "sporadic news reports" that did not even supply the undisclosed information. *Id.* at 127 (internal quotation marks omitted). As for *MidAmerica Federal Savings & Loan Ass'n v. Shearson/American Express, Inc.*, 886 F.2d 1249 (10th Cir. 1989), the claim there (which was actually under the Oklahoma statutory equivalent to section 12(a)(2)) was based on an oral statement that was undeniably false. We did not address the issue of materiality but held that liability for the false oral statement could not be escaped by the delivery of a prospectus (containing correct information) after the customer had agreed to enter into the new investment strategy when the customer "had no reason to believe the prospectuses would reveal information that would radically change the transaction." *Id.* at 1256. We are not

18

holding that an outright false statement is immaterial if publicly available information contradicts it. What is involved here is a claim that accurately reported information must be updated; in this circumstance, we think the "total mix" includes readily available information providing that update.

Finally, Plaintiff argues that summary judgment was inappropriate on materiality because it offered expert testimony that the omissions were material, the stock price dropped after the August 8-K was released, and Chesapeake restructured its hedges in the fall of 2008 to avoid the consequences of falling gas prices. But none of that evidence can overcome the fact that the May 8-K supplied essentially all the information whose absence in the Registration Statement is the basis of Plaintiff's claim. Additional disclosure would not have "altered the total mix of information available" to investors. *Slater*, 719 F.3d at 1197 (internal quotation marks omitted).

## C. McClendon's Margined Stock

Chesapeake's CEO at the time of the offering, Aubrey McClendon, owned more than 5% of the company. Most of his shares were held in margin accounts and pledged as collateral for hundreds of millions of dollars of loans. McClendon had purchased the shares on margin using borrowed money. So long as the price of Chesapeake stock rose, the shares provided sufficient collateral for the loans. In fact, the quantity of shares held in the accounts would be in excess of collateral requirements and federal regulations would allow him to take excess cash or securities out of the margin accounts. *See* 12 C.F.R. § 220.4(e)(1), (2).

19

Unfortunately for McClendon, Chesapeake stock plummeted during the financial crisis. Rather than enjoying excess collateral, he had to sell nearly all his Chesapeake stock between October 8 and 10, 2008, to meet margin calls. These sales were disclosed after the market closed on October 10. McClendon released a public statement saying: "These involuntary and unexpected sales were precipitated by the extraordinary circumstances of the worldwide financial crisis . . . . In no way do these sales reflect my view of the company's financial position or my view of Chesapeake's future performance potential." Aplt. App., Vol. II at 535 (internal quotation marks omitted). The closing price of Chesapeake's stock declined from 27.567 on October 3 to 15.7471 on Friday, October 10, although it bounced back up to close at 20.5704 on October 14.

Plaintiff argues that the Registration Statement was inadequate because it did not disclose that McClendon "had risked nearly all his Chesapeake shares on margin loans." Aplt. Br. at 51. This failure to disclose, it argues, violated section 11 both because it was required by 17 C.F.R. § 229.403(b) (Item 403(b)) and because it made the Registration Statement misleading. *See Slater,* 719 F.3d at 1196 (liability under section 11 attaches "for omissions of facts that are required as part of a registration statement or those necessary to make the statement not misleading"). We disagree. The Registration Statement included the disclosures about McClendon's stock that are required by Item 403(b), and further disclosure was not required.

To be sure, the disclosures about McClendon's holdings were limited. The Registration Statement included an SEC form DEF 14A filed on April 29, 2008, stating

20

only that McClendon owned 29,529,975 shares of Chesapeake (5.5% of the total shares outstanding) and that 29,332,493 of those shares were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts." Aplt. App., Vol. I at 177 n.(d). But Item 403(b) does not require much on form DEF 14A. It states in pertinent part:

> Security ownership of management. Furnish the following information, as of the most recent practicable date, in substantially the tabular form indicated . . . . Show [in the first two columns the class of stock and the name of the owner,] in column (3) the total number of shares beneficially owned and in column (4) the percent of the class so owned. Of the number of shares shown in column (3), indicate, by footnote or otherwise, the amount of shares that are pledged as security . . . .

17 C.F.R. § 229.403(b).[4]

Plaintiff contends that Chesapeake's disclosure did not comply with Item 403(b) because the disclosure of how many shares McClendon *held* in margin accounts did not disclose how many shares *were pledged* as collateral. It correctly points out that just because a security is held in a margin account does not mean that it serves as collateral. *See Capital Mgmt. Select Fund LTD. v. Bennett*, 680 F.3d 214, 228 (2d Cir. 2012) ("Margin accounts move up or down with . . . the price movements of the collateral. . . . [I]f [the broker] was not asking for more collateral, some of [the client's] securities [held

---

[4] These disclosure requirements apply "to each class of equity securities of the registrant or any of its parents or subsidiaries, including directors' qualifying shares, beneficially owned by all directors and nominees, naming them, each of the named executive officers as defined in Item 402(a)(3) (§ 229.402(a)(3)), and directors and executive officers of the registrant as a group, without naming them." 17 C.F.R. § 229.403(b).

in margin accounts] were probably excess collateral."). Federal regulations prescribe special rules for excess margin securities, which are defined as securities in a margin account "having a market value in excess of 140 percent of the total of the debit balances in the customer's account . . . which the broker or dealer identifies as not constituting margin securities." 17 C.F.R. § 240.15c3-3(a)(5). And regulations provide that margin excess—securities or cash held in a margin account that exceed collateral requirements— can be taken out of a margin account. *See* 12 C.F.R. § 220.4(e)(1), (2).

But while Plaintiff is correct that not all shares held in margin accounts necessarily serve as collateral, there is no merit to its claim that Chesapeake's Item 403(b) disclosures were misleading. Item 403(b) requires disclosure of shares pledged as security and permits doing so "by footnote or otherwise." Given that context, a reasonable investor would have understood that Chesapeake included its Schedule 14A footnote to satisfy the Item 403(b) obligation to report shares pledged as security. As Chesapeake explains, there is "no requirement that officers and directors list or describe the accounts in which they hold corporate stock." Aplee. Br. at 33. The obvious purpose of the footnote was to fulfill Chesapeake's Item 403(b) obligation, not to needlessly inform investors about what types of accounts McClendon owned. Indeed, Plaintiff adopted this commonsense reading of Chesapeake's disclosure in the allegations of its amended complaint. Paragraph 34 of the amended complaint describes the disclosure as

22

"the statement that Defendant McClendon had margined his stock."[5]  Aplt. App., Vol. I at 54.  Nowhere does the complaint allege that the disclosure violated Item 403(b) or was misleading because it communicated only which types of accounts McClendon's shares were held in, without stating how many shares were actually pledged as collateral. Rather than complain about lack of disclosure of pledges, it complains of lack of disclosure of McClendon's personal financial resources (which proved to be inadequate to protect against the need to sell stock on the market to cover margin calls).  But Item 403(b) does not require that.

---

[5] In full, the relevant paragraph of the complaint reads as follows:

> The Registration Statement failed to disclose the true risk and uncertainties concerning Defendant McClendon's holdings of Chesapeake stock. Chesapeake's Form 14A, dated April 29, 2008, which was incorporated by reference in the Registration Statement, represented that Defendant McClendon beneficially controlled 29,529,975 shares of Chesapeake stock and footnoted that 29,332[,]493 of those shares were "held in bank or brokerage margin accounts or escrow accounts securing brokerage accounts."  This statement was an inaccurate statement of material fact because the Registration Statement failed to disclose that Defendant McClendon lacked the cash necessary to satisfy his margin loans such that if there was a significant decline in the value of his investments, the stock would be seized and sold into the market, thereby causing a significant decline in the price of Chesapeake stock.  Furthermore, *the statement that Defendant McClendon had margined his stock* did not fully and adequately advise investors of the true risks and uncertainties regarding this action. Indeed, investors did not know that Defendant McClendon lacked the financial resources necessary to satisfy his margins loans such that, if the value of his investments declined, his stock would be seized and sold into the market.

Aplt. App., Vol. I at 53–54 (emphasis added).

23

Far from being misleading, Chesapeake's disclosure method was a conservative way to fulfill Item 403(b)'s requirement. Securities that are excess margin one day can become required collateral the next day if they decline in value. *See* Securities Credit Regulation § 3:53 (2d ed. 2013) ("If, as a result of changes in market values, the customer's debit balance increases . . . , the customer's margin excess is eliminated, and the amount is no longer available to the customer for new securities transactions or withdrawals."). All shares held in margin accounts are vulnerable to margin calls, depending on movements in the market. The disclosure that Plaintiff insists on—listing exactly the number of shares serving as collateral at the moment of reporting—can understate risk by obscuring the fact that other shares held in margin accounts might be needed as collateral in the future.

Chesapeake's failure to specify how many of McClendon's shares actively served as collateral was not a *material* omission because, if anything, it provided an excessive warning of risk by overstating the number of collateralized shares. The purpose of the Item 403(b) disclosure was to alert investors to the possibility that McClendon's interests were not aligned with their own. *See* 71 Fed. Reg. 53158, 53197 (Sept. 8, 2006) (because shares used as collateral "may be subject to material risk or contingencies that do not apply to other shares," they "have the potential to influence management's performance and decisions"). The amended complaint emphasized the importance of this purpose:

> [A]n investor knowing of McClendon's personal financial risk might fear
> that McClendon would be motivated to cause Chesapeake to take short-
> term risks in the hope of keeping stock prices high in the short-term at the

24

> expense of long-term growth . . . or to make large bonus payments to him if
> his personal investments sour.

Aplt. Br. at 59. Item 403(b) disclosures also alert investors to the possibility that a company's stock price will fall because a large shareholder like McClendon may be forced to sell many shares at once. But a prudent investor worried about these risks would assume that all of McClendon's shares held in margin accounts were pledged as collateral. A reasonable investor would have understood the risks inherent in McClendon's margined-stock holdings based on Chesapeake's disclosures. (Plaintiff does not argue that the omission was material because it could have made potential investors *less* likely to purchase shares.)

Plaintiff argues, however, that even if Chesapeake complied with Item 403(b), it had an independent duty "to disclose that McClendon lacked the resources to meet any potential margin call." *Id.* at 67. Because McClendon lacked the necessary financial resources, he had to sell large numbers of shares over a short period of time, presumably depressing the stock's value.

We reject Plaintiff's argument that further disclosure was required. The risk of margin calls and the consequent need of the owner of the stock to sell shares is obvious. Even the wealthiest investor could lack readily available liquid assets to cover a large margin call, particularly when, as here, the call comes when financial markets are frozen (meaning very few assets are truly liquid). No purpose would have been served by "disclosing" that McClendon might have to sell a large portion of the margined stock if

25

the bottom dropped out of the market.  In a similar context, Judge Sweet noted that "'[i]t is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market.'"  *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 164 (S.D.N.Y. 1986) (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)).

In addition, the omission of information regarding McClendon's financial resources is actionable only if the omission was necessary to make something in the Registration Statement not misleading.  *See Slater*, 719 F.3d at 1196.  Yet Plaintiff has not pointed to what statement was misleading because of the absence of the disclosure.  The Registration Statement contains no representation of McClendon's capacity to cover margin calls with his financial resources.  In *Slater* the plaintiff contended that the offering documents were misleading because they did not disclose that the repurchase agreements entered into by the issuer of the stock had cross-default  provisions (so that default on one constituted a default on the others).  We rejected the contention, explaining:

> [T]he Plaintiffs cannot show how the omission of the cross-default provisions made the statement misleading.  The statement merely mentions Thornburg's dependence on repurchase agreements to borrow money and that a decline in the value of their ARM assets could trigger a margin call. There is no mention about the possibility of failing to meet a margin call or its consequences.  Default, let alone cascading default, is an entirely different subject that is not even broached in the statement.  Because the statement gives no impression, one way or the other, about the effect on the company of failing to meet a margin call, there is no basis for believing the statement was misleading.

26

*Slater*, 719 F.3d at 1204.  So here as well.

*In re Franchard Corp.*, 42 S.E.C. 163, 1964 WL 67454 (July 31, 1964), relied on by Plaintiff, does not assist its cause.  In that case the controlling shareholder, whose reputation was the essential ingredient of the stock offering, had engaged in extensive financial shenanigans, which, if disclosed, would have warned potential investors of his questionable character and the financial precariousness of the new company.  Nothing remotely similar has even been alleged here.

In short, we reject Plaintiff's contention that the Registration Statement was misleading because of its failure to disclose that McClendon lacked the financial resources to always be able to cover his margin calls.  The Registration Statement said nothing to the contrary and the risk was obviously inherent in the quantity of margined stock disclosed.

## III.    CONCLUSION

We AFFIRM the district court's grant of summary judgment to Chesapeake.  We GRANT Chesapeake's request for judicial notice.